JESSIE STALLCUP GRIGSBY v. ELIZA J. REIB ET AL.

No. 2353.  Decided February 26, 1913.

**1.—Common Law Marriage.**

Though neither license nor solemnization of religious or official ceremony are necessary to constitute a lawful marriage, a mere contract between a man and woman that they thereby become husband and wife is not alone sufficient. It is necessary that they also assume the relation in fact by professedly living and cohabitating as husband and wife. (Pp. 602-608.)

**2.—Same—Charge.**

See instructions held properly given and others properly refused, defining what is necessary to constitute a valid common law marriage. (Pp. 599, 600.)

**3.—Same—Adoption of Common Law.**

The rule recognizing marriage by contract and cohabitation was not in existence in England in 1840, when the Common Law of England was adopted by the Republic of Texas (Rev. Stats., 1895, art. 3258), the Act of Parliament of 1823 having made compliance with statutory requirements necessary. But the "Common Law of England" adopted by the Congress of the Republic was not the modified one then existing in that country, but that which was declared by the different courts of the United States, and with which those who framed the statute were familiar. (Pp. 600, 601.)

**4.—Case Limited.**

Simmons v. Simmons, 39 S. W., 639, criticised and limited. Rule as to effect of obiter dicta in judicial decisions discussed. (Pp. 602, 603.)

**5.—Common Law Marriage—Proof.**

Evidence to support a claim of common law marriage by agreement to assume the relation of husband and wife followed by cohabitation considered

and held to present facts under which a verdict finding against the existence of such marriage, approved by the appellate court, was conclusive upon the Supreme Court. (Pp. 599; 609.)

**6.—Same.**

Marriage is not a contract, but a status created by mutual consent of one man and one woman. The method by which it is solemnized or entered into may be by proceedings prescribed by statute, or by mutual agreement with cohabitation, such cohabitation being professedly as husband and wife, and public so that by their conduct towards each other they may be known as husband and wife. (P. 608.)

Error to the Court of Civil Appeals for the Fifth District, in an appeal from Dallas County.

Jessie Stallcup, taking the name and claiming to be the surviving wife of G. M. D. Grigsby, deceased, sued Mrs. Reib and others to establish her rights in alleged community property of deceased and herself. Defendants had judgment which was affirmed on plaintiff's appeal, and thereupon she obtained writ of error.

*Parks, Patton & Plowman,* and *W. H. Allen,* for plaintiff in error.— The testimony in this case being undisputed that the plaintiff in error was the common law wife of Grigsby, deceased, the court erred in submitting the question as to whether she was married to Grigsby to the jury for their determination. Joske v. Irvine, 91 Texas, 574, 44 S. W., 1063; Lee v. Railway Co., 89 Texas, 583, 36 S. W., 65.

To constitute a common law marriage it requires only the agreement of the man and woman to become then and thenceforth husband and wife. Baker v. Ashe, 80 Texas, 356; Simmons v. Simmons, 39 S. W., 640; Chapman v. Chapman, 88 Texas, 641, 32 S. W., 871; Ingersoll v. McWillie, 9 Texas Civ. App., 543, 30 S. W., 56; Cumby v. Henderson, 6 Texas Civ. App., 519, 25 S. W., 673.

It was not necessary to their marriage, its consummation or completion, that they professedly either live or cohabit together as husband and wife; or, second, that they live or cohabit together in pursuance of such agreement of marriage; and, third, in view of the testimony that the marriage was to remain a secret for a time, they did not have to professedly do anything to complete and consummate the marriage. I. & G. N. Ry. Co. v. Lehman, 28 Texas Civ. App., 1, 66 S. W., 215; Gulf Colorado etc. Ry. Co. v. Allbright, 7 Texas Civ. App., 21, 26 S. W., 251; Gonzales v. Adoue, 94 Texas, 125.

*W. L. Crawford, Jr.,* and *Wendell Spence,* for defendants in error.— The trial court did not err in submitting to the jury for their determination the issue whether the plaintiff in error was married to Grigsby, the agreement of marriage being testified to only by plaintiff, who was shown to be a prostitute and the mistress of a notorious house of prostitution, and her statement being discredited by her own life and her course of conduct and by her own statements. Pegg v. Pegg, 115 N. W., 1027; Robinson v. Robinson, 188 Ill., 371; McKenna v. McKenna, 180 Ill., 577; Cox v. State, 117, Ala., 103, 41 L. R. A., 760.

Parties capable of contracting a marriage may enter into a present

contract, to accept each other as husband and wife, but it is essential to the validity of such a marriage that the parties do in fact assume the marriage status and make their contract effective by living and cohabiting together as husband and wife.   Edelstein v. Brown, 95 S. W., 1129; Pegg v. Pegg, 115 N. W., 1027; Port v. Port, 70 Ill., 484; Robinson v. Robinson, 188 Ill., 371; Cartwright v. McGown, 121 Ill., 398, 12 N. E., 737; Klipfel v. Klipfel, 124 Am. St. Rep., 99.

MR. CHIEF JUSTICE BROWN delivered the opinion of the court.

Jessie Stallcup Grigsby, hereafter styled plaintiff, instituted this suit in a District Court of Dallas County against Eliza J. Reib, hereafter designated defendant.   The husband of Mrs. Reib was joined, but, they having been divorced, he was dismissed from the case.

G. M. D. Grigsby, a childless widower, and brother of Mrs. Reib, died in 1906 leaving a valuable estate, much of which was claimed and held by Mrs. Reib under her brother's will.   There is no question of defendants' title to the property except as the claim of plaintiff may be superior thereto.   We will therefore omit all description of the property and state the plaintiff's claim.

Plaintiff was keeping what she terms a rooming house in Dallas, in fact, an assignation house, in which girls roomed and received their visitors, and to which men with women resorted for illicit purposes. Adopting the statements of plaintiff and her witness as true, the facts were, in substance, that Grigsby's wife having died, he visited plaintiff in her place and they agreed to be husband and wife and then began sexual intercourse, he coming to that house at different times and frequently.   They occupied the same room and the same bed and indulged their sexual desires.   Grigsby called plaintiff his wife and introduced her to some persons as such.   Plaintiff continued her business, and sold beer to the girls and their visitors and to such others as visited her house.   Her business was conducted in the name of Jessie Stallcup; she had her bank account in that name; she did not assume the name of Grigsby until after his death.   Grigsby died at Jefferson in 1906, and defendants, under lawful claim, took possession of his property, at least of that part in suit which plaintiff claims to have been acquired by Grigsby after her alleged marriage to him, wherefore she claims one-half of it as community property.

The foregoing statement presents the plaintiff's case.   We deem it unnecessary to state the facts relied upon by the defendant because the law which must control can be more clearly stated under this plain condensed statement of plaintiff's claim.

The court gave to the jury this charge: "The court instructs you that a common law marriage is legal and valid under the law of Texas, and neither the issuance of license or ministerial or official marriage ceremony is necessary to constitute a lawful and binding common law marriage.   All that is necessary to constitute such a marriage is, that if the parties mutually agree and consent together to become husband and wife and thereafter carry out that agreement and live and cohabit together as husband and wife, the marriage would be valid under our law.   If you find and believe from the evidence that the plaintiff and the deceased, G. M. D. Grigsby, on or

about the 10th day of April, 1905, mutually consented and agreed together with each other to become husband and wife with the intention at that time of living and cohabiting with each other as husband and wife, and that in pursuance of such agreement, if any, they did professedly live and cohabit together as husband and wife, you will find for the plaintiff that she was the common law wife of the deceased, G. M. D. Grigsby. If however, on the other hand, you fail to find that plaintiff and deceased, G. M. D. Grigsby, mutually consented and agreed together with each other to become husband and wife on or about April 10, 1905, or if you find that plaintiff and deceased, Grigsby, did not professedly live and cohabit with each other as husband and wife in pursuance of such agreement, if any, you will find for the defendant, Eliza J. Reib.''

The plaintiff in error challenges the correctness of the charge by this proposition of law: ''In order to constitute a valid common law marriage where the parties have mutually agreed and consented together to become husband and wife, it is immaterial as to whether the husband and wife either carried out the agreement or whether they either lived or cohabited together as husband and wife.'' The proposition clearly defines the issue which must be decided by this court in disposing of the case. If the proposition correctly states the law, the court erred in the charge and the judgment must be reversed.

The marriage asserted in this case, if sustained at all, must find its support and sanction in the common law in force in this State; therefore, the first question to be settled is, what rule of the common law must govern in arriving at our conclusion?

In the year 1840 the Congress of the Republic enacted a law which embraced Article 3258 of our Revised Civil Statutes of 1895, which reads:

''The common law of England (so far as it is not inconsistent with the Constitution and laws of this State) shall, together with such Constitution and laws, be the rule of decision, and shall continue in force until altered or repealed by the Legislature.''

In 1823, by Act of Parliament, all marriages in England were required to be performed according to the requirements of the statute, the common law on that subject being thereby abrogated. (Laws of England, Vol. 16, pp. 278-286.)

We must first ascertain what the Congress of the Republic intended to designate by the language: ''The common law of England.'' If it was intended to adopt the common law as it was in force in England in 1840, then we have no common law on the subject of marriage, for none such was in force in that Kingdom at that date. Our courts have uniformly recognized the existence in this State of the common law which permitted marriage without compliance with the statute upon that subject; therefore, we conclude that ''the common law of England'' adopted by the Congress of the Republic was that which was declared by the courts of the different States of the United States. This conclusion is supported by the fact that the lawyer members of that Congress who framed and enacted that statute had been reared and educated in the United States and would nat-

urally have in mind the common law with which they were familiar. If we adopt that as our guide and source of authority, the decisions of the courts of those States determine what rule of the common law of England to apply to this case.

The effect of the Act of 1840, supra, was not to introduce and put into effect the body of the common law, but to make effective the provisions of the common law so far as they are not inconsistent with the conditions and circumstances of our people. Clarendon Land I. A. Co. v. McClelland Bros., 86 Texas, 185.

In the courts of the different States of the United States there are two lines of cases between which we must choose, which Mr. Freeman on his notes to cases in 124 Am. St. Rep., 111, 112, states, in substance, as follows: Both lines of authority rest upon the doctrine that marriage is a civil contract, and that no marriage can be binding which does not rest upon the consent of the parties. One rule is "that a marriage is complete when the parties agree, in words of the present tense, to take each other as husband and wife." That statement of the law is endorsed by Mr. Freeman, in support of which he cites a number of cases. The other rule is stated thus: "An assumption of the marriage status is essential to a common law marriage, that an agreement presently to be husband and wife is not sufficient to constitute marriage until it is acted upon by the parties."

The question presented in this case is of first importance; indeed, it lies at the foundation of good society. In Sheffield v. Sheffield, 3 Texas, 86, our first Chief Justice Hemphill said:

"The nature, object and important purposes of the contract should have their just influence upon the mind. The parties have pledged themselves, not only for their own happiness, but for purposes important to society, to live together during the term of their natural lives. This engagement is the most solemn and important of human transactions. It is regarded by all Christian nations as the basis of civilized society, of sound morals, and of the domestic affections; and the relations, duties, obligations and consequences flowing from the contract are so important to the peace and welfare of society as to have placed it under the control of special municipal regulations, independent of the will of the parties. The mutual comfort and happiness of the parties are the principal, but not the only, objects of the engagement. It is intended, also, for the benefit of their common offspring, and is an important element in the moral order, security and tranquillity of civilized society."

In his work on the conflict of laws Judge Story said:

"The contract of marriage is the most important of all human transactions. It is the very basis of the whole fabric of civilized society. The status of marriage is *juris gentium,* and the foundation of it, like that of all other contracts, rests on the consent of the parties. But it differs from other contracts in this, that the rights, obligations, or duties arising from it are not left entirely to be regulated by the agreements of parties, but are, to a certain extent, matters of municipal regulation, over which the parties have no control by any declaration of their will. It confers the status of legitimacy on children born in wedlock, with all the consequential rights, duties, and privi-

leges thence arising; it gives rise to the relations of consanguinity and affinity; in short, it pervades the whole system of civil society." (Sec 109, pp. 185-6.) .

Appreciating the importance of the issue we have devoted much time, thought and research to its solution. As we have stated above, the question must be decided according to the common law as we may find it applicable to this State.

We will re-state the issue to be decided in this case. Every marriage must be by contract, express or implied; that is, the relation of husband and wife must be assumed as such by mutual consent.

The contract between parties to be husband and wife is a civil contract; that is, it is not a church ordinance, or rite. In this State marriage may be contracted without compliance with the statute and without a ceremony by an officer, or minister of the gospel.

To present the issue of law sharply, we quote from Simmons v. Simmons, 39 S. W., 639, in which Judge Williams, then on the Court of Civil Appeals of the First District, in his usual clear style said: "To constitute such a marriage, it requires *only* the agreement of the man and woman to become *then* and *thenceforth* husband and wife. When this takes place, the marriage is *complete.*" (The italics are the writer's.) To illustrate the legal proposition announced by that able and careful lawyer and judge, I will use this hypothetical case. A man, whom I will designate as B, and a woman, C, meet and in writing or orally agree to then become husband and wife. B says: I, B, now take you, C, to be my lawfully wedded wife for and during our natural lives. C responds: I, C, now take you, B, to be my lawfully wedded husband for and during our natural lives. Without a kiss or embrace the couple bow politely and separate. There are no witnesses and no publication of the marriage and no conjugal relations. Are they husband and wife under the laws of this State?

It is well settled in this State that a marriage without a license or ceremony may be lawfully entered into when by consent of both parties they professedly as husband and wife cohabit and maintain that relation. The proposition submitted by counsel for plaintiff in error is, "to constitute a common law marriage, it requires only the agreement of the man and woman to become then and thenceforth husband and wife." The District Court refused a charge embodying that proposition of law, which is assigned as error.

If the proposition announced and quoted above is a correct statement of the law, then B and C would be husband and wife although they should never meet again.

Before entering upon an examination of the authorities we must understand the rules by which the authoritative force of an opinion must be determined. Dictum is defined to be: "An opinion expressed by a court, but which, not being necessarily involved in the case, lacks the force of an adjudication; an opinion expressed by a judge on a point not necessarily arising in a case; an opinion of a judge which does not embody the resolution or determination of the court, and made without argument, or full consideration of the point; not the professed deliberate determination of the judge himself."

As to the weight to be given to such expressions we cite Tompkins

& Co. v. Bennett, 3 Texas, 48. In that case Judge Lipscomb said: "On the trial in the court below, the judge was not called upon to decide on the legal effect of a foreign bankrupt law, out of the limits of its own territory. Whether it could affect real or personal property, one or both, belonging to the bankrupt in other countries, were questions not made, and therefore not responded to by the judge. Nor was he called on to decide on any conflict of claim, between a citizen of Texas and one claiming under the bankrupt's assignment in the United States. Any discussion of those questions now would be traveling out of the record; and, in my opinion, violating the appropriate duty of an appellate tribunal."

The phrase quoted from Simmons v. Simmons, supra, could only apply to a case in which the parties entered into a contract in words of the present tense and did no more. The facts did not call for the conclusion of law there expressed because there was in the Simmons case cohabitation to the extent that the court presumed therefrom a marriage contract. The statement that a marriage can be established only by a contract in *præsenti* was not relevant to the facts of that case and it is not entitled, as to that statement, to be regarded as a judicial decision. But the facts showed such cohabitation as proved the contract and that case was decided upon the proposition that the marriage was to be conclusively presumed from the character of the cohabitation. That case is not authority for the proposition that B and C were husband and wife; the marriage in the Simmons case did not rest upon the contract *alone.* Judge Williams said: "The parties, under the evidence, should have been treated as husband and wife from the time when they assumed that relation, and a charge to that effect requested by appellant should have been given." The conclusion reached is that the parties were husband and wife from the time they *assumed* that relation, not from the time of making the contract; therefore, the marriage was not formed by the contract alone, but by consent and cohabitation, which is sound doctrine.

The writer has examined every case that he could discover in the Supreme Court library which had a bearing upon the question before the court, and has found but two cases in which a common law marriage has been sustained in the absence of any cohabitation or other acts of consummation. In Jackson v. Winne, 7 Wend., 47, 22 Am. Dec., 563, the facts stated were: "It appeared that Enoch was arrested in the year 1800, on the complaint of the overseers of the poor of the town of Blenheim, under the bastardy act, on a charge of having gotten Joanna with child. He was taken to the house of Joanna's father, and thence with the father and the mother of Joanna, in company of the constable, to a justice of the peace to be married. The justice asked Enoch and Joanna if they consented to be married, and told them to join hands; Enoch dropped his hand and turned from Joanna; she took it and held it until they were pronounced man and wife. The justice hesitated when Enoch refused to take Joanna's hand, but proceeded in a minute or two and concluded the ceremony. It was customary for the justice to offer a prayer, but he did not do so on this occasion, and Joanna's father did so instead. During the whole time Enoch said nothing. After the ceremony, Joanna re-

turned to her father's house, but Enoch did not go with her, nor did they ever afterwards cohabit.'' Under that state of facts the court held that the marriage was valid. There was neither cohabitation nor contract; but that court held that it was a contract on the part of the man, who, being a prisoner, stood mute, refusing his hand to the woman who seized it and made the declarations. If it be conceded that Enoch by silence gave consent and thereby made a contract then to become and thereafter to be her husband, it stands as one of two cases within my reach that sustain the proposition that a marriage by contract *alone* establishes the status of husband and wife.

Mr. Freeman, who attained a great reputation as an annotator, in a note to Klipfel v. Klipfel, 124 Am. St. Rep., 112, says: ''The true rule, however, is that a marriage is complete when the parties agree, in words of the present tense, to take each other as husband and wife. Cohabitation or copulation following such agreement may be evidence of the existence of the agreement, but it adds nothing to the agreement and is not essential to the validity of the marriage: Dumarseley v. Fishly, 10 Ky. (3 A. K. Marsh), 368; Jackson v. Winne, 7 Wend., 47, 22 Am. Dec., 563. Said the Supreme Court of Minnesota in the leading case of Hulett v. Carey, 66 Minn., 327, 61 Am. St. Rep., 419, 69 N. W., 31, 34 L. R. A., 384: 'Upon this state of facts the contention of the appellants is, that there was no marriage, notwithstanding the execution by them of the written contract; that, in order to constitute a valid common-law marriage, the contract, although *per verba de præsenti*, must be followed by habit or reputation of marriage—that is, as we understand counsel, by the public assumption of marital relations. We do not so understand the law. The law views marriage as being merely a civil contract, not differing from any other contract, except that it is not revocable or dissoluble at the will of the parties. The essence of the contract of marriage is the consent of the parties, as in the case of any other contract; and, when there is a present, perfect consent to be husband and wife, the contract of marriage is completed. The authorities are practically unanimous to this effect. Marriage is a civil contract *jure gentium*, to the validity of which the consent of parties able to contract is all that is required by natural or public law. If the contract is made *per verba de præsenti*, and remains without cohabitation, or if made *per verba de futuro*, and be followed by consummation, it amounts to a valid marriage, in the absence of any civil regulations to the contrary. The maxim of the civil law was, '*Consensus non concubitus facit matrimonium.*' The whole law on the subject is that, to render competent parties husband and wife, they must and need only agree in the present tense to be such, no time being contemplated to elapse before the assumption of the status. If cohabitation follows it adds nothing in law, although it may be evidence of marriage. It is mutual, present consent, lawfully expressed, which makes the marriage. 1 Bishop on Marriage, Divorce and Separation, secs. 239, 313, 315, 317. See, also, the leading case of Dalrymple v. Dalrymple, 2 Hagg. Const., 54, which is the foundation of much of the law on the subject. To the same effect is the recent case of Davis v. Stouffer (Mo. App.), 112 S. W., 282.''

Let us understand the distinction between the two contentions on this question. The first, just stated; the second is: "That an assumption of the marriage status is essential to a common-law marriage; that an agreement presently to be husband and wife is not sufficient to constitute marriage until it is acted upon by the parties."

Both propositions embrace consent of the parties—the contract— for there can be no marriage without such contract; therefore, we again state that for a decision to be authority for the proposition upon which plaintiff in error relies, that a marriage is complete by the contract, the case must not embrace in its facts cohabitation or any form of consummation, for it would not then be a case of marriage by contract *only.* Keeping that distinction in mind, we will review the authorities cited by Mr. Freeman and appraise their value in this investigation.

In Dumarseley v. Fishly, 10 Ky., 368, the question was squarely before the court, and a divided court held that a marriage by contract, without any subsequent recognition by the parties, constituted a valid marriage. Chief Justice Boyle delivered the opinion concurred in by Justice Owsley. The parties had gone from Kentucky to Indiana for marriage, which was the home of the bride's father. A license was procured and a ceremony performed, but the bride refused to cohabit. We infer these facts, which are not fully stated. The majority said: "Marriage is nothing but a contract; and to render it valid it is only necessary, upon the principles of natural law, that the parties should be able to contract, willing to contract, and should actually contract. A marriage thus made, without further ceremony, was, according to the simplicity of the ancient common law, deemed valid to all purposes, and such continued to be the law of England until the time of Pope Innocent the Third." Judge Mills dissented in a very able opinion, and contended for the rule that cohabitation was necessary to complete a marriage by agreement. Besides, the marriage was entered into in the State of Indiana and should have been determined by the law of that State. I can find no decision by the Supreme Court of Indiana that promulgates the "contract only" doctrine.

Hulett v. Carey, 66 Minn., 327, 61 Am. St. Rep., 419, cited by the annotator, was based upon these facts: The man and woman had lived in the same house, she as housekeeper, and entered into a contract of marriage in writing in the present tense, after which they occupied the same bed and lived secretly as husband and wife. The court said: "The law views marriage as being merely a civil contract, not differing from any other contract, except that it is not revocable or dissoluble at the will of the parties. The essence of the contract of marriage is the consent of the parties, as in the case of any other contract; and, whenever there is a present, perfect consent to be husband and wife, the contract of marriage is completed." But there was such cohabitation as would have made the marriage valid and the use of the common phrase was dicta; that was not a marriage by *contract alone.* That court really rested the decision upon the cohabitation.

Dalrymple v. Dalrymple, 2 Hagg. Const., 54, is cited to the same

proposition. The case originated in Scotland and was decided under the law of that country; but in that case the contract was definite and the parties cohabited. The husband was an army officer and visited the wife as an army officer would, and treated her as his wife. The case does not support the position that marriage by contract only was valid in Scotland.

Davis v. Stouffer, 112 S. W., 282, was decided by the Court of Appeals of Missouri at Kansas City. The opinion was written by Justice Ellison, who quotes as the law this language: "When there is mutual consent, in the present tense, between the parties, they are married." The judge expended much time in research and argument to establish a proposition unsound and not involved in the facts of that case, which show that cohabitation followed immediately upon the making of the agreement and continued until the man's death. In so far as that case asserts that consent without cohabitation or assumption of the marriage status constitutes marriage in Missouri, it is in direct conflict with Topper v. Perry, 197 Mo., 531, 114 Am. St. Rep., 777, in which the Supreme Court of that State said: "Under our law marriage is a civil contract, by which a man and a woman agree to take each other for husband and wife during their joint lives, unless it is annuled by law, and to discharge toward each other the duties imposed by law upon such relation. Each must be capable of assenting and must, in fact, consent to form this new relation. When the consent to marry is manifested by words *de præsenti*, a present assumption of the marriage status is necessary."

The authorities cited do not sustain Mr. Freeman's contention.

The counter-proposition to that asserted by Mr. Freeman and submitted by defendant in error is that an agreement to be husband and wife not followed by cohabitation does not constitute marriage. Hawkins v. Hawkins, 142 Ala., 571, 110 Am. St. Rep., 53; Topper v. Perry, 197 Mo., 531, 114 Am. St. Rep., 777.

We are confident that there is no state court—except in the two cases cited—which holds such marriage without cohabitation to be valid. There are a number of cases in which the "stock phrase," "Marriage is a civil contract and to constitute such marriage requires only the agreement of the man and the woman to become then and thenceforth husband and wife," is used, but in each case, which sustained the marriage, except the two, there was cohabitation.

We deem it unnecessary to cite the great number of cases which hold that marriage by contract is not valid unless it be followed by acts of consummation; however, we will add the following cases with this quotation from Hutchins v. Kimmell, 31 Mich., 126, 18 Am. Rep., 164: "Whatever the form of ceremony, or even if all ceremony is dispensed with, if the parties agreed presently to take each other for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties, and which would subject them and others to legal penalties for a disregard of its obligations. This has become the settled doctrine of the American courts; the few cases of dissent or apparent dissent being borne down by a great weight of authority in favor of the rule as we have stated."

In addition we cite: Pegg v. Pegg, 138 Ia., 572; McKenna v. McKenna, 180 Ill., 577; Tart v. Negus, 127 Ala., 301; Travers v. Reinhardt, 205 U. S., 440.

The fallacy of the phrase so frequently quoted is in the fact that it ignores the correct definition of marriage, that it is a status—the relation of husband and wife. A status cannot be created by contract.

The attitude of this court on this question is best shown by the excellent opinion written by Judge Lightfoot in Ingersol v. McWillie, 30 S. W., 36, which was approved by this court. Judge Lightfoot said: ''Each mutually agreeing that they would then and thenceforth be husband and wife, and upon the faith of such mutual agreement and promise they then and thenceforth cohabited and lived together as such husband and wife and so continued.'' The opinion was approved by this court on application for writ of error. Ingersol v. McWillie, 87 Texas, 647.

In Simmons v. Simmons, 39 S. W., 639, the court granted a divorce, but refused a charge to the effect that their property rights should be determined as arising when the marriage relation was assumed. Judge Williams said: ''The parties, under the evidence, should have been treated as husband and wife from the time when they assumed that relation, and a charge to that effect requested by appellant should have been given.'' If the contract created the status of husband and wife, surely the property rights began then, and if the right of property began when the relation was assumed, the contract did not constitute the marriage.

The logical mind of the author of the opinion in the last above named case reached the correct result and demonstrated the absurdity of the doctrine that marriage is a contract by showing that the rights of the parties arise out of the status of husband and wife in fact, not in theory.

Marriage was not originated by human law. When God created Eve, she was a wife to Adam; they then and there occupied the status of husband to wife and wife to husband. When God created the first pair, He gave the command: ''Multiply and replenish (people) the earth,'' which was enjoined upon their expulsion from the garden. When Noah was selected for salvation from the flood, he and his wife and his three sons and their *wives* were placed in the Ark, and when the flood waters had subsided and the families came forth, it was Noah and his wife and each son and his wife, and God repeated to them the command: ''Multiply.'' All of the duties and obligations that have existed at any time between husband and wife existed between those husbands and wives before civil government was formed. The truth is that civil government has grown out of marriage; marriage by cohabitation, not by contract, which created homes, and population, and society, from which government became necessary to settle differences in matters of private interest, to protect the weak and to conserve the moral forces of society, to the support of religion and free government. In what respect does the *contract of marriage* of B and C contribute to their happiness? How does that marriage benefit society? It will contribute nothing to sustaining the dignity of the State, nor add to its citizenship. Such a contract, if it be

regarded as such, is worse than a *nudum pactum,* for it is without consideration or obligation to or from either party. Such life is in defiance of the commands of God, and in disregard of every obligation to society and State. Such a transaction has but one element of a contract, mutual consent to do nothing for themselves, their country, or their God. The abstract theory has had little influence in the determination of causes except to confuse the judicial mind. Contract marriages exist when the parties, for some pecuniary or social advantages, have desecrated the sacred status by their union, and such marriages often furnish business to the divorce courts and scandals to society.

If the rule of law claimed in this case is not given effect it should be repudiated, because it is unsound and inapplicable to present conditions, serving only to confuse courts and juries. If it were put into effect, as is sought to be done in this case, it would open a wide door with a strong invitation to perjury and fraud. It would be a menace to the heirs of men like Mr. Grigsby and make their estates the prey of the bawd and the adventuress, with no possible safeguard, one party being dead and no witnesses to the contract nor publicity of the marriage. One of the parties to such a contract might marry and raise a family and, dying without disclosing the former marriage, the "common-law widow" could come forward, claim to be the surviving wife, and thus displace the woman who had borne the hardships of wife and mother, brand the children as bastards and take the position as survivor with her rights in the estate. A rule for the regulation of the sacred rights of marriage and the rights of families that make such wrongs possible should not be recognized in civilized governments.

The term, "civil contract," as applied to marriage, means nothing now, for there does not exist the church's claim that it is a religious right; there is nothing to be differentiated by the language; it is obsolete. Marriage is not a contract, but a status created by mutual consent of one man and one woman. The method by which it is solemnized, or entered into, may be by proceedings prescribed by statute, or by mutual agreement with cohabitation, but, however contracted, having the same elements and producing the status of husband and wife. The sole difference which can legally exist is in the method of expressing consent, and the only particular in which a marriage as at common law can differ from the statutory method is the absence of license and the ceremony. The cohabitation must be professedly as husband and wife, and public, so that by their conduct towards each other they may be known as husband and wife. Such marriages may be equally the consummation of a mutual affection which will produce a home and family that will contribute to good society, to free and just government and to the support of christianity—to the common weal. It would be sacrilegious to apply the designation "a civil contract" to such a marriage. It is that and more; a status ordained by God, the foundation and support of good government, and absolutely necessary to the purity and preservation of good society. When the "wedding day" of the parent ceases to be revered by the offspring

there will be a weakening of the family ties and a lowering of the standard of marriage and home.

The court instructed the jury correctly, and the jury seem to have found correctly on the facts. The judgments of the courts are affirmed,

*Affirmed.*