## J. NYE v. THE STATE.

### No. 3620. Decided June 16, 1915.

#### Rehearing denied October 13, 1915.

**1.—Fornication—Common Law Wife—Sufficiency of the Evidence.**

Where, upon trial of fornication, the defense was that the woman was defendant's common law wife, and the facts tended to show a common law marriage between the parties, yet, when considered as a whole, a reasonable conclusion only could be drawn that their apparently assumed relationship of husband and wife was merely for the purpose of covering up and preventing detection in their real illicit relationship, and that the arrangement between them was in substance and actual effect to appear married rather than to be married, the conviction for fornication was sustained. Davidson, Judge, dissenting.

**2.—Same—Evidence—Intent—Marriage License.**

Where, upon trial of fornication, the question of defendant's intent in the sexual relations between him and the said woman was a material inquiry, the marriage license procured by him by which he was thereafter lawfully married to another woman, were admissible in evidence to show that defendant never intended that the relationship which existed between him and the alleged woman was really and truly that of husband and wife.

**3.—Same—Intent—Common Law Marriage.**

Though the intention of the woman was that they should be husband and wife, her intention could not control. It took the intent of both and each of them to make a common law marriage.

Appeal from the County Court of Harris. Tried below before the Hon. C. C. Wren.

Appeal from a conviction of fornication; penalty, a fine of $250.

The opinion states the case.

*A. B. Wilson,* for appellant.—On question of common law wife and insufficiency of the evidence: Berger v. Kirby, 105 Texas, 611; Greisby v. Reid, 105 Texas, 597; Levy v. Goldsoll, 131 S. W. Rep., 420; Harlan v. Harlan, 125 S. W. Rep., 950; Burnet v. Burnet, 83 S. W. Rep., 238;

Burks v. State, 94 S. W. Rep., 1040; Edelstein v. Brown, 100 Texas, 403; Jackson v. Banister, 105 S. W. Rep., 66; Knight v. State, 116 S. W. Rep., 56; Wofford v. State, 60 Texas Crim. Rep., 624, 132 S. W. Rep., 929; Bargna v. Bargna, 127 S. W. Rep., 1156; G., H. & S. A. Ry. Co. v. Cody, 92 Texas, 632; Chapman v. Chapman, 88 Texas, 641; Ingersoll v. McWillie, 87 Texas, 647; Simon v. State, 20 S. W. Rep., 399; Simmons v. Simmons, 39 S. W. Rep., 639; Cumby v. Garland, 25 S. W. Rep., 673.

*C. C. McDonald,* Assistant Attorney General, *John H. Crooker,* and *E. T. Branch,* for the State.

PRENDERGAST, Presiding Judge.—Appellant was prosecuted and convicted of fornication. He waived a jury and tried his case before the judge, who found him guilty and assessed a $250 fine as his punishment.

The woman with whom he is charged to have committed this offense was Kittie Ensby. On her direct examination she testified:

"My name is Kittie Ensby. I have lived in Houston two years. I came here in January, 1913. I came by myself. Since I came here I have been working at Levy Brothers' Dry Goods Store. After I came here I lived with Mr. Nye, the defendant. I first began living with him along about May, 1911, and I began to live with him in Houston after I came here in 1913. I do not know just the exact date to which I continued to live with him, but it was up to about a month ago, some time in February, 1915. During the time I lived with the defendant in Houston our room was at Mr. Lieder's residence. We had the same room there, occupied it and slept together there. He had carnal intercourse with me during the time I lived with him here in Houston. I am not a married woman. I know about the defendant marrying recently. It has been about two weeks ago that he married; I am not positive of the exact date. I do not know where he and his wife are now living." This is the whole of her testimony on direct examination.

Appellant's defense, as we understand it, was that this woman was his common law wife, and, therefore, his cohabiting and carnal intercourse with her would not make him guilty of fornication.

After Kittie Ensby had so testified on direct examination, she was cross-examined. Then after that was concluded, redirectly examined, and this occurred back and forth several times. The trend of these examinations might tend to show some facts indicating a common law marriage between these parties; yet, when it is considered as a whole, the reasonable conclusion only can be drawn that their apparently assumed relationship of husband and wife was merely for the purpose of covering up and preventing detection in their real illicit relationship, or as expressed by the judge before whom the case was tried, in his qualification to one bill, as follows: "The court was of the opinion and found as a fact that both defendant and Miss Ensby were unmar-

ried at the time of the alleged fornication and that the arrangement that had been made between them was, in substance and actual effect, to appear married rather than to be married and thus cover up their illicit relations." And as expressed by the judge in his qualification of the other bill: "The court found from the evidence that such arrangement as existed between defendant and Miss Ensby was merely to cover up their illicit relations and its purpose was to insure that the parties appear married without being married."

We think it unnecessary to go into a detailed statement of this woman's testimony, which establishes the state of facts as found by the trial judge. Suffice it to say, that the effect of it is that she claims they first met in Nebraska in January, 1911; that about May, 1911, as expressed by her in one place in her testimony: "I said to him, 'let's live together as man and wife,' and he said, 'all right,' and no mention was ever made of a ceremony or anything of that sort." And in another place she says the proposition to thus live together came from her and not from him. She then shows that they announced it to their friends that they were married and that they went on living together as husband and wife would; that he traveled for a while, and in some of his travels she went about with him and they registered as man and wife; that they were not together all the time but were separated a part of this time, presumably because of his traveling about or her visiting others; that in about January, 1913, he landed in Houston, and six weeks later she followed him there and they renewed their relationship at Houston and continued such relationship until he married another woman under a regular license and by a proper officer in Houston on March 2, 1915.

There is an entire absence of any evidence whatever showing that before they assumed the said relationship that he wooed and won her for his real wife. In one place she testified that at the time of the said agreement that they were to live together as man and wife, it was made at her instance and suggestion, and she said: "I thought some day I would be his wife. I was his wife then, but by saying that some day I thought I would be his wife I mean that I thought that some day we would get a marriage license and go through the ceremony." She says at that time *she* really intended and expected to be his wife some time and she *thought* that was *his* intention; that he said it was. In another place she says: "Mr. Nye did not tell me recently that our marriage was a mock marriage. I knew I was not married to him and he did not have to tell me I was not. I did not regard myself as his legal wife. I went by his name for protection, so that people would not know how we came to be living together." In another place she said: "I do not know what Mr. Nye intended when we first went together. I do know that he is not living with me now. I have not talked to him with reference to his being married again. I do not know the exact date we quit living together, but it is somewhere in the neighborhood of a month. As to the reason I took Mr. Nye's name, we agreed to be man and wife and naturally I would take his

name. I do not still claim to be his wife. I could not very well be his wife now. He has got another one now."

It is beyond controversy the law of this State that a real common law marriage properly agreed to by both parties and properly consummated by both, is a valid and legal marriage. (Griggsby v. Reib, 105 Texas, 597, 153 S. W. Rep., 1124; Melton v. State, 71 Texas Crim. Rep., 130, 158 S. W. Rep., 550.) And if these parties had really thus been married appellant would not have been guilty, even though without a divorce he subsequently attempted to legally marry and would otherwise have legally married another woman. As the testimony in this case, without any sort of doubt, authorized the trial judge to find that these parties were not thus married, we deem it unnecessary to discuss this question further.

As the question of appellant's intent in the sexual relation between him and said woman, Miss Ensby, was a material inquiry, the marriage license procured by him on March 2, 1915, authorizing him to marry Lennie B. Williams, another woman, and the return thereon showing that he did so marry her on that date, was clearly admissible. Not only did the testimony of said woman, Kittie Ensby, show that they were not legally married under the common law, but his act of marrying another woman without any pretense of a divorce from her, would show and tend to show that he never intended that the relationship that existed between him and said Kittie Ensby was really and truly that of husband and wife. His acts showing his intent speak louder than words. Even though the intention of the woman was that they should be husband and wife, her intention could not control. It took the intent of both and each of them, and if his intent was lacking there could be no common law marriage, even though that might have been her intention.

We have carefully examined the record in this case and read and studied the evidence, in addition to hearing appellant's attorney read it in the submission of the case, and we think, without doubt, the correct conclusion was reached by the trial judge, and the judgment is affirmed.

*Affirmed.*

[Rehearing denied October 13, 1915.—Reporter.]

DAVIDSON, JUDGE (dissenting).—The conviction was for fornication. I am persuaded that from the evidence appellant was guilty of bigamy. The testimony of the woman with whom the fornication was alleged shows that she first met the defendant in January, 1911, and they began living together as husband and wife in May, 1911, and that they continued to live together as such until about a month before this prosecution was instituted, which was the 8th of March, 1915, as husband and wife, and that they lived together nearly four years. She says: "He and I had an understanding and agreement that we would be man and wife. I introduced him as my husband and he introduced me as his wife. Since that time I have been known as Mrs. Nye. Prior to that time there was no improper relationship between us at all;

that is, prior to May, 1911. Since that time we have lived together continuously as husband and wife during the time we have been together, up until about a month ago. During that time we have resided together and been introduced as husband and wife and gone about together as husband and wife. That has been ever since May, 1911. I came to Houston from Oklahoma in January, 1913. Prior to that time I had been absent from Mr. Nye about a month. I had been visiting my sister in Oklahoma. That was the occasion of my absence from Mr. Nye. Then I came right on to Houston. Mr. Nye was stopping at the Bristol Hotel in Houston and I went right on to his room immediately on my arrival in Houston. Then he and I began to look for a boarding place, and went out to Mr. Lieder's and have been boarding there since that time. Since the time he and I agreed to marry we have both recognized each other publicly and introduced ourselves publicly everywhere as Mr. and Mrs. Nye. During that time I was certainly in every way faithful to him as his wife. Mr. and Mrs. Lieder addressed me as Mrs. Nye. While I was employed at Levy Brothers I was employed as Mrs. Nye. I received my mail as Mrs. Nye. Mr. Nye traveled for a while when we first married and we stopped at hotels and registered as Mr. and Mrs. Nye. I have never been known by any other name except Mrs. J. H. Nye since we agreed to be married in May, 1911. My relatives and friends know me as Mrs. Nye, and so do my sisters and brothers. At the time this agreement was entered into that Mr. Nye and I should marry and live together as husband and wife I thought some day I would be his wife. I was his wife then, but by saying that some day I thought I would be his wife I mean that I thought that some day we would get a marriage license and go through the ceremony. At the time we agreed to live together as husband and wife I really intended and expected to be his wife from then on. I thought that was his intention. He said it was. The agreement that we should live together as man and wife was made in Omaha, Nebraska. Immediately after we made that agreement Mr. Nye introduced me as his wife. I do not remember any particular names of people to whom he introduced me, but they were just friends that we would meet. My brother lived in Omaha at that time and we introduced ourselves to him as man and wife right afterwards and told him that we had married. It was published in the Omaha paper that we had married. During the time we lived together Mr. Nye has been supporting me as a man does his wife. From the date we made the agreement it was my intention to be his wife from that day on. That was my purpose in making the agreement and I have complied with that agreement, and have remained his wife as much as I could outside of a formal ceremony. Mr. Nye did not tell me recently that our marriage was a mock marriage. . . . I went by his name for protection, so that people would not know how we came to be living together. I used the money that I made when I worked at Levy Brothers for my own self. I do not know whether Mr. Nye got any of the money I made. He did not take my earnings. As a matter of fact, Mr. Nye

did not in any way mislead me. We both agreed to be husband and wife. We have lived together continuously since then as husband and wife and he has supported me as his wife. When I say that I took his name for protection, I mean for him to protect me as his wife; I never had any other intention than to be his wife; had no other purpose in view. We were not just temporarily living together, but I intended to be and to remain his wife, and the only thing that we did not do was to follow out a formal ceremony by getting a license. As to my earnings, each one of us has at times let the other have money, just as a man and wife would. I have let him have some of my earnings at various times, but I never kept any account whatever of it, and never charged him with any of it. It was all in the family. Mr. Nye took out insurance on his life in my favor as his wife, and named me in the policies as his wife."

Mr. Fred Lieder testified that the defendant and Mrs. Nye, with whom he is charged with committing fornication, lived at his house and did light housekeeping for nearly two years. They slept together; had one bedroom and one bed. "When they were living in my house I understood they were man and wife and they went under the name of Mr. and Mrs. Joseph Nye."

Another witness testified, speaking of Miss Ensby or Mrs. Nye, says: "She came to the store and addressed Mr. Nye as her husband and asked for him as her husband. The first I knew that Miss Ensby was not Mrs. Nye was when some investigation was made by the Federal officers. Prior to that time, as far as I know, she was reputed to be Mrs. J. H. Nye, the wife of the defendant, and they were living together as man and wife, and were known as such to me and to everybody else, so far as I know and I never heard anything to the contrary until this investigation."

This is enough of the testimony to indicate the relation of the parties. I do not care to enter into a discussion of this testimony. For nearly four years these parties lived together as husband and wife, publicly and everywhere; known among their relatives as being husband and wife, and wherever they went and wherever they traveled they were known as husband and wife publicly and to everybody. Enough of the testimony has been repeated to show that if a common law marriage could be had by the facts and acts and circumstances, there is enough here to satisfy any fair mind, it occurs to me, that this was a common law marriage. This comes within the rule laid down by the Supreme Court in Griggsby v. Reib, 105 Texas, 597, 153 S. W. Rep., 1124. The Griggsby case lays down the correct rule, and under that rule this was a common law marriage. The "status" was fixed by the parties, to be annulled only by death or divorce. This question has been so often decided in Texas that it would be a work of supererogation to cite the cases. I, however, cite Cueno v. De Cueno, 59 S. W. Rep., 284; Simmons v. Simmons, 39 S. W. Rep., 639; Burnett v. Burnett, 83 S. W. Rep., 238; Simon v. State, 31 Texas Crim. Rep., 186; 26 Cyc., 382, 19 Am. & Eng. Ency. of Law, p. 1204.

A common law marriage is valid if the parties agree to live together and carry out the contract. Defendant and this woman lived together, took upon themselves all the responsibilities, duties and obligations that belong to the marital relation, such as holding themselves out to the world as husband and wife and carrying on their business relations and matters of that sort, dealings with society, and were so received and acknowledged, and they themselves so acknowledged and thus fixed their "status." I do not know how facts could more clearly show a common law marriage than this record shows. It is in evidence by the State that the husband, or appellant, took out a life insurance policy in favor of the woman as *his wife,* traveled with her as such, registered at hotels, paid all her expenses, and they handled their funds as a family usually do, and as husband and wife. Everybody understood them to be husband and wife; they published it in the newspaper at the time of the marriage, and announced it to her brothers and sisters, and by them so accepted, received and treated. It would hardly be questioned if there had been a child born of this relation and one of the parties died, that the child would have inherited legally whatever was coming to it as an heir of the deceased parent. I would ask how long would it take parties to recognize each other as married people in order to constitute such relation of common law marriage? If four years is not sufficient length of time to fix and determine that status, how long would it take for the parties to publish to the world and hold themselves out as husband and wife to constitute such status a common law marriage?

I make these short observations, believing the opinion to be wrong in holding the relation of these parties to be that of fornication. The case shows bigamy on the part of the appellant, and not fornication.

The judgment ought to be reversed and the cause remanded.