## FRAME v. FRAME. (No. 8159.)

Court of Civil Appeals of Texas. San Antonio.
Feb. 13, 1929.

Rehearing Denied March 20, 1929.

T. H. Ridgeway and Edwin G. Black, both of San Antonio, for appellant.

White, Wilcox & Taylor, of Austin, for appellee.

COBBS, J. Appellant, the widow of David A. Frame, deceased, brought this suit against appellee as executor to recover on a promissory note, substantially as follows:

"April 19th, 1922.

"I promise to pay to my wife on conditionary, the sum of Five Thousand ($5,000.00) Dollars, providing she stays with me while I live and take care of things as she always has done: this note not due for six months after my death, and to bear no interest until due. This note to have no lien on my property while I live. Providing that should my wife die before me, this note will become due to her father, Curtis Stanfield.

"This April 20th, 1922.

"D. A. Frame."

Among other defenses set up, appellee, by way of cross-action, alleged that decedent had on deposit in the Frost National Bank just before his death $1,700, being his separate estate, and that appellant the day preceding her husband's death withdrew $1,000 and later withdrew $504.25, which appellee sought to recover.

Appellant answered that the money had been placed there subject to the check of either, for the purpose of paying expenses incidental to the operation of the farm, upon which they all lived, and for the purpose of paying household expenses during the summer and spring of 1925. She used the money for that purpose, so that after the death of her husband the money was used to pay the expenses of operating the farm and for household expenses, and she alleged that she and her minor daughter were entitled, out of the estate of her husband, to have a sufficient amount for their maintenance, and the amount of money drawn from the bank was not sufficient for such purposes.

There were other sums charged against her, but they were all disposed of by the judgment of the trial court.

It was shown that David A. Frame died three years and ten days after he executed this note. He bequeathed $5,000 to four of the grandchildren. He gave to his wife a life estate in the farm upon which he and his wife resided. His eldest son was appointed independent executor and acted as such.

The inventory listed all his property as his separate estate, notwithstanding the fact that they lived together as man and wife for about 18 years.

There are but few real questions of law in this case, and they grow out of a proper construction of the note. Was appellant entitled to judgment for the face of said instrument with legal interest?

We shall dispose of the question at once as to whether appellee is permitted to attack the validity of said note without a sworn plea challenging the consideration. The note on its very face discloses the consideration, and from its own language discloses the true consideration, and the same is not subject to attack without a sworn pleading.

It must be remembered that they had lived together for about 15 years before the note was executed, and thereafter until his death, which occurred about 3 years later. When she married him she was 31 years old, a young, stout, healthy woman, and he was a matured man of 71 years old. He died at the age of 89 years.

The woman was indeed a splendid type of a wife, and she rendered in that relation all kinds of domestic service and drudgery that a wife is not ordinarily required to perform. We quote from appellant's brief:

"Mr. Frame had been married prior to his marriage to Mrs. Fannie S. Frame, and had five children by his prior marriage. Mrs. Fannie S. Frame was a school-teacher prior to her marriage to Mr. Frame. They were

married on January 29th, 1907, and lived together until his death on May 1st, 1925. At the time of their marriage Mr. Frame was about 71 years of age. He was 89 at the time of his death. At the time of their marriage he owned 328 acres of land in Bexar county, upon which they established their home. Mrs. Frame was a willing worker. The evidence disclosed that she did her house work, cooked for hired hands, kept the books, looked after the collection of rents, helped look after the grubbing of more than 200 acres of land, often made trips to town to buy parts for plows annd farming implements, and made one or two trips to town each week for eighteen years to peddle butter. She did most of her washing and ironing. She had to frequently go to the blacksmith shop. She hauled most of the seed that was used on the farm, hauling 500 or 600 pounds at a time. Mr. Frame had considerable property and was amply able to have hired some one to do the extra work Mrs. Frame was required to do.

"Hugh Stanfield testified, about the kind and character of work he had seen Mrs. Frame do. At one time he heard Mr. Frame tell her to hurry up with her dinner and as soon as dinner was over to go down and get the mowing machine and get it fixed. He also testified to having seen her going to town once or twice a week with butter.

"As shown by bill of exception he heard Mr. Frame say, 'She can slash around and do more work than any woman, I ever saw; I have given her a note for $5,000.00 payable after I croak.'

"Mrs. Frame's mother also testified as to the hard work Mrs. Frame performed.

"A child was born to Mr. and Mrs. Frame in December, 1922, after the note was executed on April 19th, of the same year."

This is a remarkable case; it is one in which the husband and wife were unusual companions and helpmates. Though he was fairly compensating her by giving her the note for $5,000 and a life estate in his property, still it may be, had he not given her the $5,000 note, he would have given her a fee-simple title to the land in lieu thereof. He knew and felt his obligation to the good wife more deeply than any one else could realize. They were congenial and happily mated.

It is true, as Mr. Chief Justice Brown said in Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011: "Marriage is not a contract, but a status created by the mutual consent of one man and one woman." And the Good Book further recognizes the institution and says that those whom God hath joined together let no man put asunder. It is fully recognized by all our laws and is the most sacred obligation ever assumed by man and woman.

If she had not given her life, labor, and devotion to her old husband, he would have had to employ some one to do the work, for nothing but her volition could have compelled her to do it.

■ There is no inhibition against a husband conveying property to his wife. In Sparks v. Taylor, 99 Tex. 424, 90 S. W. 489, 6 L. R. A. (N. S.) 381, our Supreme Court has said: "The cases cited,. as well as others which might be referred to, establish as the law in this state these propositions: (1) The husband may enter into contracts with his wife concerning their property rights. He may purchase land from her and may sell land to her. He may borrow money from her, and he may pay the debt, just as he would to any other creditor. He may become her trustee or agent for the investment of funds which belong to her, the same as he may assume those relations to any other person. In fact, his power to contract with her seems to be limited only by her incapacity to convey land to him because of the fact that he cannot join her in the conveyance. (2) A married woman may, when joined by her husband, sell or mortgage her separate property. She may, with her separate funds, buy real or personal property from her husband or another, which will be her separate estate. She may borrow money, and by mortgage bind her separate estate for its payment, or she may make her separate property surety for her husband's debt or for the debt of a third person with her husband's concurrence."

In the case of Taylor v. Leonard (Tex. Civ. App.) 275 S. W. 135, the court said, in part: "What are commonly called the disabilities of coverture are not, in fact, civil disqualifications inherent in the female sex, nor are they a necessary or natural sequence to the assumption of the marriage relation. In the absence of some positive law to the contrary, the right of contract is a necessary incident to the right to own and hold, property. The law does not prohibit a married woman from contracting. She commits no offense by making contracts, or by performing them. What the common law does is to relieve her of personal liability upon certain kinds of contracts which are binding on all others who are sui juris. The law does not undertake to penalize her marriage, but to protect her after marriage from the usual legal consequences of her business engagements. Her contracts are not void, but only voidable. It is not the aim of the law to impose a burden, but to grant an immunity designed for her good."

In the case of Pitts et al. v. Elsler, 87 Tex. 347, 28 S. W. 518, the Supreme Court ruled: "In this state the right of a married woman to acquire and hold property, real and personal, either by gift, devise, descent, or purchase, is as absolute as that of her husband. She may, with his consent, mortgage her real estate to secure his debts, or she might give her personal property to him, or to any other person. If she contract to buy on a credit, and execute a note for the price, she may or

not, as she may elect, proceed with the contract, and the person contracting with her cannot refuse to carry out the agreement because she is a married woman. If she elect to abandon the contract, she cannot be compelled * * * to complete the unexecuted part of the contract; but when she elected to abandon the trade she must determine for herself, as if she were a man, whether it was to her advantage to refuse to proceed, and, having so decided, she has only such remedies as a man would have had under the same state of case. It would be a novel case for a plaintiff to allege that the defendant had done no wrong in the transaction, but that, because she was not bound to carry out her agreement, she was entitled to relief against her own deliberate act, which was lawful in itself, or, if unlawful, would not put the defendant in the wrong. If she is damaged by the result, she had it in her power to have protected herself by paying the remainder of the price and taking the goods; and if the property purchased was not, in her opinion, of sufficient value to justify this, she has the advantage, over a man, of abandoning the contract, and escaping responsibility for other damages than the sum advanced."

The trial court concluded that the defendant's recovery of $1,000 should be offset by the twelve months' maintenance allowance of $600 and by the expenses in the sum of $400 paid by plaintiff on account of funeral and last illness of the deceased; and that no recovery can be had by either party on account of these items; and that an offset should be made of the value of the bond against the last item of $504.25. We believe this to be a just and fair disposition of the accounts between the parties, and therefore affirm it.

The most important feature in this case is: Shall the appellant recover on the note? From what has been said it will be seen that we believe the note to be a valid and binding obligation and that appellant is entitled to recover thereon.

The judgment of the trial court is reversed, and judgment is here rendered for appellant as above set out.

Reversed and rendered.