The principal question involved in this appeal is whether at the time of the death of William E. Giordano on August 27, 1944, the defendant in error, hereinafter referred to as petitioner, was his common-law wife. The issue arose in proceedings which petitioner, who had once been known as Marie Maddox, instituted in the county court of Oklahoma county, for the appointment of herself as administratrix of said decedent's estate. Contesting petitioner's right to said appointment on the ground that she was not the intestate's widow, were the plaintiff in error (a sister of the intestate) and other persons representing themselves as his heirs. When, after a hearing on the matter in the county court, said court entered its order appointing the petitioner, said contestants appealed to the district court. Upon trial de novo, the latter court also held for the petitioner. In the present appeal from the district court's judgment, plaintiff in error, hereinafter referred to as contestant, contends that said court erred in admitting certain portions of the petitioner's testimony and that the judgment is not supported by sufficient evidence.
Regarding the first proposition we note petitioner testified, inter alia, that she resided in the intestate's home at 5301 North Lincoln in Oklahoma City, almost four years immediately preceding his death, and that during said period, she and the intestate lived together as husband and wife. Contestant maintains that the evidence on the latter point, other than said testimony of the petitioner herself, is wholly insufficient to establish that such relationship existed between the parties during said residence, and she contends that the trial court committed reversible error in admitting petitioner's testimony to establish it, in view of 12 O. S. 1941 § 384, forbidding a party "to testify in his own behalf, in respect to any transaction . . . had personally by such party with a deceased person . . ." On the other hand, petitioner maintains that the admission *Page 694 
of such testimony, if error, was harmless as there was an abundance of other evidence adduced to establish the parties' relationship during the period they resided in the same house. With this we agree.
The record discloses that petitioner testified without objection that in November, 1940, when she moved to the Giordano residence on North Lincoln from where she had been residing on Northwest Second street in Oklahoma City, she was the widow of one William H. Maddox, who died in 1938, that she had known Giordano 26 or 27 years, and that he was a widower.
It is obvious from the trial judge's rulings sustaining contestant's objections to eliciting from petitioner testimony concerning various incidents that might conceivably be termed "transactions" between herself and the deceased and from his refusal to admit testimony concerning the more intimate characteristics of their relationship, that he concurred in council's opinion that section 384, supra, applied to such testimony and that he made an effort to enforce it. As hereinbefore noted, however, the petitioner was allowed to testify that she and Giordano bore the relationship to each other of husband and wife during the period in question. But an examination of the record reveals the correctness of petitioner's contention that there was other evidence to the same effect, and if this sufficiently establishes that she was Giordano's common-law wife, then, owing to the presumption of correctness that accompanies the judgment of a trial court on appeal, this court, in the absence of an affirmative showing to the contrary, must assume that the judgment in question was based upon the evidence that is uncomplained of herein, rather than that portion which is said to be inadmissible.
In arguing that the evidence other than the allegedly inadmissible portion of the petitioner's testimony is insufficient to sustain the judgment, contestant says that to establish a common-law marriage, there must be proof of a mutual agreement between the parties to enter into a matrimonial (as distinguished from an illicit or meretricious) relation, as well as proof of cohabitation. Her counsel say that here there is no evidence whatsoever of mutual consent by Giordano and the petitioner to live together as husband and wife and no evidence of their cohabitation, except the testimony of the petitioner. Some of the authorities they cite reveal that such mutual agreement need not be proved by direct evidence. See, for instance, Graham v. Graham, 169 Okla. 568,371 P.2d 964, in which it was held:
"To establish a common law marriage in this state . . . there must be at least a mutual agreement, consent, or intention, which, however, may be implied from the conduct and actions ofthe parties, to become man and wife, followed by cohabitation as such." (Emphasis ours.)
And in Howell v. Adams, 158 Okla. 239, 13 P.2d 577, it is held:
"Common law marriage may be proved by circumstantial evidence, and since the presumption is in favor of marriage and against concubinage, the fact that a man and woman have openly cohabited as husband and wife for a considerable length of time, holding each other out and recognizing and treating each other as such by declarations, admissions, or conduct, and are accordingly generally reputed to be such among their relatives and acquaintances and those who come in contact with them, may give rise to a presumption that they have previously entered into an actual marriage although there may be no directtestimony to that effect." (Emphasis ours.)
The above quotations accord with the weight of authority in other jurisdictions. See the extensive annotation to Klipfel v. Klipfel, 41 Colo. 40, 92 P. 26, in 124 Am. St. Rep. 104, et seq.
Contestant says that none of the witnesses in the present case testified Giordano "either expressly or by implication *Page 695 
agreed to become petitioner's husband". While it is true in this case, as is not unusual in such cases, there was no direct proof that Giordano, positively and in express words, agreed to assume the marital relation with petitioner, yet there is an abundance of evidence of his conduct toward the petitioner from which the only reasonable deduction to be drawn is that the parties had such an arrangement or understanding between themselves, whether it had ever been expressed in words or not. It is an exemplification of the familiar adage that "actions speak louder than words".
Without unnecessarily lengthening this opinion with details of the testimony, it will suffice to say that it fully describes numerous occasions on which Giordano introduced and publicly acknowledged the petitioner as his wife after she came to live with him and more than two years before his death. She joined the Baptist Church in his presence as his wife. The two attended its meetings together and were known by members and the pastor of the church as husband and wife. In 1941, they registered to vote in Giordano's home precinct as husband and wife. And during the period of their residence together, various legal documents, some of which concerned property Giordano had acquired previously, were signed and acknowledged by both, in the presence of each other and various notaries public, as husband and wife.
The particular instances emphasized by counsel wherein Giordano failed to acknowledge petitioner as his wife are as hereinafter described.
According to contestant's testimony, Giordano was her brother, had visited her when their mother was ill in 1941 and again in March and April, 1942. She testified that on neither of these occasions did he ever mention or acknowledge a marital relationship with petitioner.
Pat Donohue, a witness for contestant, testified that he and his family lived near Giordano's home on North Lincoln about two and one-half years before the trial. (The trial date was April 5, 1945.) He said that during said residence, his children used to play over at Giordano's and on one occasion after the petitioner had "chased the children away from over there" Giordano learned of it and told him to " 'just forget it' " . . .; " 'that anytime the children wants to come over to play, you let them come right on, don't pay any attention to Miss Maddox, she doesn't own a thing here' and he says, 'she is just boarding, and she hasn't been paying her board' ".
Another occasion when the parties' relationship was not acknowledged was when the petitioner applied on October 24, 1942, for a position at the Douglas Aircraft Plant near Oklahoma City. For the application, which Giordano assisted her in filling out, petitioner's former name of Maddox was used and the representations made thereon were contemplated to belie or conceal her relationship with the intestate. Petitioner explained this on the witness stand by saying, in substance, that Giordano feared disclosure in such a "war plant" application of her relationship with a person having an Italian name might hinder or prevent her from obtaining such employment. Her enrollment at the Oklahoma City Trade School, which petitioner attended a short time previous to making said application (and in probable anticipation or preparation for her employment at Douglas), was also in the name of "Maddox", perhaps for the same reason.
Under the circumstances, it is quite conceivable that in each of the isolated instances above described, the intestate had plausible reasons for acting as he did, unrelated to any general design or purpose of disavowing his relationship to the petitioner. Such evidence is wholly insufficient to outweigh the great bulk of the evidence showing that decedent acknowledged the petitioner as his wife both to friends and associates of long standing, as well as to *Page 696 
the public generally, in most of the ways that this could be done in the conduct not only of his business, but also of his civic, social and religious life. In view of the overwhelming weight of the latter proof, there is ample basis in the record for implying from Giordano's conduct that he was a party to a previous mutual agreement between himself and the petitioner to become husband and wife.
The conclusion that the parties had such an agreement is further supported by their cohabitation. (As to the probative value of this fact, see the annotation to Klipfel v. Klipfel, supra.) The petitioner testified without objection that she and Giordano lived alone in the latter's five-room home. The testimony of most of the other witnesses tends to corroborate this and it is not directly contradicted by any of them. From the circumstances revealed in the evidence admitted without objection, the only reasonable inference or conclusion to be drawn is that said cohabitation possessed the essential characteristics of a marital one, rather that that petitioner's status in the Giordano home was merely that of a housekeeper, or of a boarder (as was said to have been represented in Giordano's remarks to the witness, Donahue, hereinbefore described). See the annotation, supra, pages 112 and 113.
Referring to the fact that three of contestant's witnesses (former neighbors of Giordano) testified that they had never heard anyone in the community refer to petitioner as, or say that she was, Giordano's wife, contestant asserts the evidence as to the general reputation of the marriage in the community was "divided". On this hypothesis it is argued that such testimony is no aid to the parties' cohabitation and acknowledgment of each other as husband and wife in creating the inference (essential to the establishment of a common-law marriage) that they had agreed to live as husband and wife. Counsel for the petitioner cite Clark v. Clark, 143 Okla. 91,287 P. 271, for the proposition that proof of reputation of the marital status is unncessary where there is direct evidence of the existence of a common-law marriage. In this case it is unnecessary to apply such a rule and we think it advisable to deal squarely with contestant's contention revealing it as a misconception of the true situation, rather than deciding the issue on the narrower ground that proof of the reputation of the marital status was unnecessary.
Contestant concedes that in addition to the testimony of her witnesses above described there were three others whose testimony tended to show that the couple were reputed to have been husband and wife. Thus, on the basis of contestant's version of the testimony, it will be seen that the present case presents an instance not of "divided" or "singular" reputation but merely of a conflict in the evidence as to general reputation. The distinction noted is dealt with in the note to Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124, appearing at pages 8 to 56, inclusive, of L.R.A. 1915E, where, at page 40, it is said:
"This difference, however, may be traceable to an indiscriminate use of the term 'divided repute' which fails to distinguish between a conflict of testimony as to the uniformity of repute and uncontroverted evidence showing a conflict of repute. If, undeniably, it appears that one part of the community was of one opinion and the remainder, of the other, then there is a divided repute in a true sense, and it would seem to have no probative force. But where there is a conflict of testimony as to the general repute in the community, — that is, if some witnesses testify that the parties were generally reputed to be married, and others that they were not, the question is one of credibility merely, and is for the jury, for in such circumstances there is a general repute for or against marriage, accordingly as one set of witnesses or the other is believed."
The view above expressed is supported by the majority of well-reasoned *Page 697 
authority, and we think it is the only correct one that can be taken of the matter in question. While the contestant's witnesses hereinbefore referred to testified that they (as individuals) did not know Giordano and the petitioner as husband and wife and had never heard them referred to as such, yet the proof does not go to the extent of showing that the general reputation of the parties' relationship in the community was a divided one, i.e., that in some circles or groups in the community the parties were generally regarded as husband and wife and in one or more other segments of the community they were generally regarded as not so related. Only one of the witnesses who was interrogated on the subject of the general repute of the parties' relationship answered responsively and he said: ". . . she was known as his wife." But assuming, as does contestant, that the statements of the other five witnesses were relevant to the issue, we would have merely a conflict in the evidence on the question. In that situation, the question of the general reputation, as indicated in the above annotation, was one for the trier of the facts, who in this case was the trial judge. By his judgment, he has resolved said question in favor of the petitioner, and as we have seen, such decision is amply supported by proof.
It being our opinion that if the trial court erred in admitting the testimony said to be inadmissible herein, said error was harmless in view of other evidence admitted without objection, and that on the basis of the latter, the judgment cannot be said to be clearly against the weight of the evidence, said judgment is hereby affirmed.
GIBSON, C.J., HURST, V.C.J., and RILEY, BAYLESS, and WELCH, JJ., concur.