### BOBBITT v. BOBBITT. (No. 1662.)

(Court of Civil Appeals of Texas. Amarillo. May 12, 1920. On Motion for Rehearing, June 16, 1920.)

**1. Marriage ⬅⬆20(1)—Ceremony not necessary where agreement made effective by cohabitation.**

"Marriage" is a status, the living together of a man and a woman as husband and wife, under an agreement, express or implied, which need not be solemnized by any ceremony, or be under license from the state, where the agreement is made effective by the parties living together publicly as husband and wife.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Marriage.]

**2. Marriage ⬅⬆50(1)—Evidence held to sustain finding of common-law marriage.**

In a divorce suit evidence *held* such that the finding of the jury that there was an agree-

ment for common-law marriage consummated by cohabitation could not be set aside.

**3. Marriage ⬅⬆48—Evidence of continuance of status in state other than where common-law marriage was contracted is admissible.**

In an action for divorce alleging a common-law marriage agreement in Texas followed by cohabitation there, evidence of a continuance of cohabitation in another state was admissible to show that the relation from its beginning was lawful, and not meretricious; the length of the status being proof of its existence.

**4. Divorce ⬅⬆149—Finding that parties agreed property accumulated should be joint not inconsistent with finding that parties were common-law husband and wife.**

In a divorce suit, a finding that plaintiff and defendant agreed to work together to a common purpose, the proceeds of their labor to become their joint property, was not inconsistent with a finding that plaintiff and defendant had entered into a common-law marriage agreement made effective by cohabitation continuing for about 30 years.

**5. Trial ⬅⬆295(5)—Omissions from instructions not error where covered by instructions as a whole.**

Objections that an instruction on evidence of a common-law marriage omitted the requirements that the agreement must be for life, and that the cohabiting must be public, are not well founded, where instructions as a whole properly cover such matters.

**6. Trial ⬅⬆244(3)—Instruction held not to unduly emphasize living in same house over holding out to public as common-law husband and wife.**

The language "living in the same house in like manner as marks the intercourse between husband and wife" in an instruction on evidence of common-law marriage *held* not erroneous as laying undue stress on the occupancy of the same house and detracting from the lawful importance of their holding themselves out to the public as husband and wife, in view of other parts of the instructions.

**7. Trial ⬅⬆260(1)—Appellant may not complain of refusal of instruction where his position therein is otherwise presented.**

Where appellant's position as to a certain phase of the law as set forth in his refused instructions was adopted and sufficiently presented to the jury in another instruction, he cannot complain.

**8. Appeal and error ⬅⬆1071(5)—Inconsistency in immaterial findings held not to affect verdict.**

Immaterial inconsistency in findings *held* not to explain and throw light on other material findings in the case so as to affect general verdict.

**9. Appeal and error ⬅⬆1058(3)—Where witnesses testified to plaintiff's reputation for chastity, the exclusion of one instance was harmless.**

In an action for divorce and alimony, where the marriage was denied by defendant, any error in excluding testimony that plaintiff gave

birth to an illegitimate child several years before the alleged common-law marriage to defendant was harmless, where many witnesses testified that plaintiff's reputation for chastity at that time was bad.

**10. Appeal and error ☞1062(5) — Error in submission of issue as to division of property held immaterial in view of finding of common-law marriage.**

Any error in submission of issue as to agreement as to division of property *held* immaterial in view of finding of a common-law marriage between the parties.

**11. Husband and wife ☞270(7)—Defendant must plead and prove laws of another state not recognizing community property, where part of property was accumulated.**

In an action for divorce and division of community property, it was only necessary for plaintiff, wife, to allege that such property was acquired by joint labor during their marriage to make out her case as to its character under Rev. St. 1911, art. 4623, and husband's general denial and plea of limitations was insufficient to permit a defense that they lived part of the time in a state where the wife had no shares in such property, and he should have pleaded such facts and pleaded and proved the laws of such state to warrant such issue.

**12. Appeal and error ☞1050(1)—Opinions or conclusions of witnesses are harmless where basic facts were given.**

In a divorce action on alleged common-law marriage, evidence that plaintiff and defendant held themselves out as common-law husband and wife and members of the same family in another state, if objectionable as conclusions of the witnesses, was harmless, where each detailed at length the facts upon which the statement was based.

**13. Appeal and error ☞1058(2)—Exclusion of evidence that plaintiff was merely defendant's housekeeper and cook harmless, where same witnesses testified to their being reputed to be single.**

In a divorce suit based upon an alleged common-law marriage, rejection of the testimony of witnesses that they knew plaintiff on a farm and in the railway construction camps, that she was reputed to be defendant's housekeeper and cook, was harmless, where these witnesses did state that at the time they knew plaintiff and defendant they were each reputed to be single and went into detail as to the facts of the relationship between them.

**14. Witnesses ☞372(2)—Competent to cross-examine as to matters showing motive in testifying.**

In a suit for divorce based upon common-law marriage, where plaintiff's brother testified for defendant, it was proper on cross-examination to show his motives, inclinations, and prejudices and inquire as to his attempt to make plaintiff settle with defendant in a way that witness might receive benefit and of her refusal.

**15. Trial ☞85—Objection to entire evidence does not include objection to part.**

Where an objection was made to the entire evidence, if any part of it was admissible, the objection is properly overruled, though other parts were inadmissible if properly objected to.

**16. Appeal and error ☞738—Separate objections to parts of evidence should be made separate assignments.**

If separate and distinct portions of a letter are objected to as evidence, and the objector wishes such separate objections considered they should be presented in separate and distinct assignments.

**17. Evidence ☞155(8)—Where defendant put part of letter in evidence, plaintiff's introduction of remainder not error.**

In a suit for divorce based on alleged common-law marriage, where defendant, husband, introduced excerpts of plaintiff's letter to show merely an unfulfilled promise of marriage, plaintiff's introduction of the whole letter *held* not error, since the material portions tended to contradict defendant's purpose.

**18. Divorce ☞116—Testimony of effect of information of defendant's marriage to another on plaintiff's health.**

In an action for divorce based upon an alleged common-law marriage, it was not reversible error to permit plaintiff to testify as to the effect the information of defendant's marriage to another woman had upon plaintiff's health.

**19. Appeal and error ☞1056(1)—Wrongful rejection of merely cumulative evidence not harmful.**

If an answer of a witness did have the meaning appellant attaches to it so as to have been admissible, its rejection was not harmful where it was only cumulative.

### On Motion for Rehearing.

**20. Appeal and error ☞1002—Where conflicting, the truth must be separated from the false by the jury.**

On an issue of common-law marriage, where defendant's testimony was contradicted by his time books and payrolls as to plaintiff's being merely a cook, and not his wife, there was such conflict in the evidence that it required the weighing of testimony so that the court must accept part and reject part, the truth not being so manifest that it can be declared what it is in the face of a jury's finding, it being their problem to identify it from a mass of conflicts and contradictions.

**21. Domicile ☞10—Evidence held insufficient to show domicile.**

In a suit for divorce and division of community property, defendant's evidence *held* to show that he did not acquire a residence in Mississippi during his stay there.

**22. Trial ☞351(2)—Party failing to request submission of issue consents that court should decide it.**

If there was any issue as to appellant's domicile during a certain period, on account of his failure to request the submission of such issue, he consented that court should decide it, under Rev. St. 1911, art. 1985.

Appeal from District Court, Grayson County; Silas Hare, Judge.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Suit by Mary Green Bobbitt against Israel R. Bobbitt. From a judgment granting plaintiff a divorce and decreeing partition of property and appointing commissioners therefor, the defendant appeals. Affirmed.

Head, Dillard, Smith, Maxey & Head and Wolfe & Freeman, all of Sherman, for appellant.

Wood, Jones & Hassell, of Sherman, and M. W. Reily, of Meridian, Miss., for appellee.

BOYCE, J. The appellee brought this suit against the appellant for divorce and partition of property. alleged to belong to the community. She alleged in her petition that on the 25th day of May, 1886, she and the defendant ⊥ entered into a mutual agreement whereby they agreed to become husband and wife; that such agreement was consummated by the said parties living together as husband and wife for a period of about 30 years; that during such time they accumulated a large amount of property of the approximate value $500,000; that in March, 1916, the defendant abandoned her and married another woman. Since the issue in the case was not as to plaintiff's right to a divorce, but as to whether there was ever any valid marriage between her and the defendant, it will not be necessary to make any further statement of the grounds set up for divorce. Plaintiff further alleged that she entered into such marriage agreement and relation in good faith, and believed that the defendant in good faith took her to be his wife; that, if the agreement was not mutual, it was procured by the fraud of the defendant; and that, as his putative wife, she was entitled to one-half of the accumulations of their joint efforts. Plaintiff also alleged that, if it should be found that there was no valid marriage between her and the defendant, and that she was not entitled to one-half of such property as defendant's putative wife, she was, nevertheless, entitled to one-half of said property under an agreement between them that all property acquired by their joint efforts should be owned by them jointly, it being alleged in this connection that the plaintiff's labors were equally instrumental with the defendant's in the production of said property. The defendant answered by a general denial and plea of limitations. In response to special issues submitted the jury found that the plaintiff and defendant entered into a "common-law marriage," as that term was defined by the court, in Grayson county, Tex., about May 25, 1886; that while living together as husband and wife the plaintiff and defendant accumulated property of the value of $424,100; that the plaintiff and defendant agreed to work together to a common purpose, the proceeds of their labor to become the joint property of the two, and that under this agreement property of the present value

of $424,100 was acquired, and that 50 per cent. thereof represents the value of plaintiff's labor contributed to the acquisition thereof; that the plaintiff and the defendant cohabited as husband and wife from May 25, 1886, to March, 1916.. Judgment was entered granting plaintiff a divorce and decreeing partition of said property, to effect which commissioners to partition were appointed.

A large part of appellant's brief is in support of his claim that the finding of the jury that a common-law marriage between the plaintiff and the defendant was entered into and consummated in Texas is manifestly wrong and should be set aside. The statement of the evidence introduced on this issue fills more than 500 typewritten pages in the statement of facts. We will state the result of this evidence only in a very general way, but at sufficient length that the reasons for our conclusion may appear.

It is not disputed that during practically all the time from May, 1886, to March, 1916, the plaintiff and defendant lived and cohabited together. The plaintiff maintains that this relation was preceded by an agreement to live together as husband and wife, and this agreement was immediately followed and consummated by the said parties living together in such status and continuing in such relation throughout said period of time, so as to constitute the relation a common-law marriage within the decision of the Supreme Court in the case of Grigsby v. Reib, 105 Tex. 608, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011.

The defendant, on the other hand, contends that the relation in its inception was meretricious and continued so at all times while the parties were together in Texas; that, while there is sufficient evidence to justify the conclusion that the plaintiff and defendant did live together as husband and wife in other states, Louisiana, Mississippi, and Arkansas, a common-law marriage is not valid in such states, and the acts of the parties in such states cannot be taken as a consummation of an agreement of marriage without ceremony in Texas. We may say here parenthetically that the court instructed the jury that the testimony admitted as bearing upon the relations of the plaintiff and defendant in other states should be considered only for the purpose of assisting in determining whether the agreement which plaintiff testified was made preceding the beginning of their relations was in fact made, and whether the cohabitation in Texas was of such nature as to consummate a common-law marriage in this state. With this preliminary statement, we will proceed to state some of the concrete facts. For some time prior to May, 1886, both parties had been living near Farmington, in Grayson county, Tex. The plaintiff was about 19 years old at this time —a buxom, good-looking girl. She had been

cooking and doing housework in families in this neighborhood and at Denison for several years before this. A great many witnesses testified that before this time the plaintiff's reputation for chastity was bad. The testimony is such that it may be assumed that the plaintiff practically conceded the truth of this evidence. It appears that both parties had little education; that of the plaintiff appearing to be the more limited. The defendant was 24 years old, and was a tenant farmer living to himself on his rented premises. The plaintiff testified that the defendant for some time prior to May, 1886, had been calling on her declaring his love; that on the night of May 25, 1886, defendant called to see her at her father's house; that they sat on the door steps, and the defendant asked her to be his wife; that he said it was not necessary for a marriage ceremony to be performed; "that we were already married when we agreed to be man and wife and live out our lives together"; that she loved the defendant, believed what he said, and went with him that night to his house on his farm and lived with him publicly from that time as his wife. The defendant's version of the beginning of their relations was that he employed plaintiff as a cook; that he did have illicit relations with her before and during the time she was cooking for him on the farm and ever afterwards while they were together, but that nothing was said about marriage between them or their relations being that of husband and wife. Plaintiff lived with the defendant on this farm from May, 1886, until November, 1887. She testified that during this time she was held out as defendant's wife. There was no other witness who testified that during such time she was introduced or referred to by the defendant as his wife, or that she claimed to be such. Plaintiff named four persons whom she had told that she was defendant's wife. One of these was dead. Two of the others appeared and denied her statement. These two witnesses were defendant's relatives. A great many witnesses testified that while the plaintiff and defendant were living together on the farm they were both regarded as single persons; that they never heard plaintiff referred to except as Mary Ann Green (her maiden name); that the defendant went to parties and dances with other girls and conducted himself as a single man; and that the neighborhood was much scandalized by the plaintiff and the defendant living together as they were. The defendant testified that the plaintiff was employed by him as a cook and housekeeper, and that was the only kind of work she did. The plaintiff testified, and in this she is corroborated by other witnesses, that in addition to cooking and doing housework, she did all kinds of work in the field. Bobbitt left the farm in 1887, and until some time in the year 1890 was at various places in Texas doing work of different kinds with teams, most of the time doing grading work on railway construction. Plaintiff spent short intervals of time with her parents as the defendant was changing locations and getting established in camp from time to time, but during practically all of this time she was with the defendant in these various camps. The plaintiff again testified that during this period of time she was known as defendant's wife; that they occupied the same tent; that she cooked, helped feed the teams, keep time of the laborers employed in the work, and in general assisted in handling the business and doing the work in which they were engaged. In this testimony she is corroborated in part by one witness and some circumstances which we shall presently state. The defendant testified that he employed plaintiff as a camp cook; that he paid her wages regularly like any other laborer; that her name was on the time books and payrolls kept by him; that she was known in camp as Mary Ann Green, occupied a separate tent from him; that she was a camp follower—a common prostitute; that she did not help keep the books, did not have education enough to do this, and assisted him in no way in his business except as camp cook. Defendant introduced the depositions of a great many witnesses who testified to practically the same facts. Most of these witnesses claimed to be laborers working for the defendant at the various places, though some of them testified that they were contractors on adjacent work. The plaintiff introduced time books and payrolls used by defendant during this time. It may be inferred that defendant did not know that plaintiff had these books when his testimony was given. The plaintiff's name did not appear on any of these time books or payrolls as receiving wages, and much of the work of making up these payrolls and time books appears to have been done by plaintiff, the entries being admittedly in her handwriting. The names of the witnesses who claimed to be laborers for the defendant during such times did not appear on these books. There were also some other circumstances which it is claimed by appellee tends to discredit the testimony of some of these witnesses which we need not detail. In 1890 the defendant moved with his outfit to Louisiana, and for 26 years thereafter was engaged in levee work on the Mississippi and Red rivers in Louisiana, Mississippi, and Arkansas, and for a short while in Illinois. The defendant concedes that there is ample testimony that during this time the plaintiff and defendant lived together as husband and wife, and that the defendant held the plaintiff out as his wife. The defendant testified that the plaintiff went to Louisiana as his camp cook and was kept and paid by him as such for six months thereafter; that she then quit cooking and was thereafter his "kept woman."

A great number of witnesses, most of them negro laborers, testified that during this time plaintiff's reputation for chastity was bad. Some testified that she told them that she and defendant were not married; also that she was known as Bobbitt's "kept woman." The defendant also testified that plaintiff did not assist him to any extent in managing his business, that the men did not have any more respect for her than for "a yellow dog," and, in effect, that she was a hindrance, instead of a help in his business. The time books covering this period produced by plaintiff showed that they were kept largely by her, and there is ample evidence to the effect that she was an efficient and active factor in the conduct of the business, even when the defendant was present in camp, that defendant was sick a great deal, and on several occasions was absent for several months at a time on account of his health, and that at such times the plaintiff ran the business. Letters from third persons written during this time and addressed to Mrs. Bobbitt and showing that she was in charge of the particular business transactions to which they referred were offered. Many letters from the defendant addressed to the plaintiff as Mrs. Bobbitt were offered, in which the defendant went into the minutest details of the business, their investments, etc., and gave plaintiff instructions as to the handling of the business during his absence. In 1895 a son was born to plaintiff. He was known as Robert Earl Bobbitt, and was treated and educated by the defendant in the same way as if he were his legitimate son. When the boy became of scholastic age, a house was rented in Natchez, Miss., and the mother and son lived there for several years while the boy was attending school. She was known there as Mrs. Bobbitt, the defendant visited them as a husband and father would from time to time, and the plaintiff visited the defendant in the camps on the levee work. In 1915 the defendant quit the levee work, and he, the plaintiff, and the son lived together as a family in Natchez until March, 1916, when the defendant went to Hot Springs for his health, leaving the plaintiff to dispose of the camp equipment, mules, etc., that yet remained to be sold. Some time after the defendant left he informed plaintiff that he did not intend to live with her again, and later married another woman.

[1-3] Marriage is a status, the living together of a man and woman as husband and wife, under an agreement, express or implied, that such shall be their relation to each other. It is well settled in this state that the agreement need not be solemnized by any ceremony, or be under license from the state; but it is also settled that the agreement, in order to be effective, must be followed by the parties living together publicly as husband and wife. Grigsby v. Reib, supra. The court

submitted instructions to the jury substantially to this effect, and the jury found that the agreement was made as alleged by the plaintiff and consummated by the parties living together as husband and wife in Texas. The appellant contends that this finding is against the overwhelming weight of the evidence, and the finding is manifestly wrong. The appellant is supported by the testimony of a great number of witnesses, and the plaintiff is corroborated as to the status in Texas by the direct testimony of only one witness. However, she is corroborated and the plaintiff's evidence to some extent discredited by the production of the time books and payrolls. The long continuance of the status shown to have existed in the other states affords some evidence that it was a continuance of a status previously established in Texas, and that the relation from its beginning was lawful, and not meretricious. It is natural that the longer the status was continued the stronger would be the proof of its existence. The jury heard the testimony of the plaintiff and the defendant, they are the judges of the credibility of the witnesses and the weight of their testimony, and we do not think the facts disclose such a case as would warrant us in setting aside their findings.

[4] Issue No. 15 as submitted to the jury is as follows:

"Did the plaintiff and defendant ever enter into an agreement to work together to a common purpose and the proceeds of their labor to become the joint property of the two?"

The jury answered this issue in the affirmative, and in answer to issues following it found that all of the property acquired by defendant was acquired under this agreement. Under the second, third, fourth, and sixth assignments it is contended that the answers to these issues are inconsistent with the findings in response to the twentieth issue and those based on it to the effect that the plaintiff and defendant entered into the marriage agreement of May 25, 1886. We do not think there is any inconsistency in the findings. The plaintiff had testified to the agreement of May, 1886, already referred to. She further testified:

"From time to time Mr. Bobbitt and I had conversations with reference to the ownership of the property we were accumulating. We agreed that we made it together; that we made it jointly; that we worked hard for it; that we were accumulating and working in our younger days for our old age. We were to own the property together."

She also testified that she was never paid any wages, and to some extent is corroborated in this testimony.

The fifth and seventh assignments and and that part of the sixth assignment which complains that the finding referred to is un-

supported by the evidence are disposed of by our decision as to the first assignment.

[5] The eighth and ninth assignments complain of portions of the fifth paragraph of the court's charge, which is as follows:

"A common-law marriage is legal and binding under the law of Texas, and neither the issuance of a license or official ceremony is necessary to constitute a legal and binding common-law marriage. All that is necessary to constitute such a marriage is, if the parties mutually agree and consent together to become husband and wife, and thereafter carry out that agreement, and live and cohabit together as husband and wife, the marriage would be valid under our law. If you find and believe from the evidence that the plaintiff and the defendant on or about the 25th day of May, 1886, in Grayson county, Tex., mutually consented and agreed together with each other to become husband and wife, for life, and with the intention at that time of living and cohabiting with each other as husband and wife, and that in pursuance of such agreement, if any, they did, in Texas, professedly live and cohabit together as husband and wife, you will answer Question No. 1, 'Yes.' If, on the other hand, you fail to find that plaintiff and defendant mutually agreed and consented together in Grayson county, Tex., with each other to become husband and wife for life, on or about the 25th day of May, 1886, or if you find and believe from the evidence that plaintiff and defendant did not professedly live and cohabit with each other as husband and wife, in the state of Texas, in pursuance of such agreement, if any, you will answer question No. 1 'No.'"

The complaint is that the instruction omits two requirements, that the marriage agreement must be for life, and that the living together as husband and wife must be public. Marriage is for life, and the jury doubtless understood this; but it will be noted that when specific instructions were given the jury as to how they should answer the very question submitted to them the requirement that the agreement must be for life was included. The living together as husband and wife also involves the idea of publicity of the relationship. The implication of the requirement of publicity was made stronger by the further requirement that they should "professedly live and cohabit together as husband and wife." But the court left no doubt as to this requirement, for in the sixth paragraph of the charge the jury were told:

" 'Living and cohabiting together as husband and wife' means living together publicly as if the conjugal relation existed, living in the same house in like manner as marks the intercourse between husband and wife."

We are of the opinion that the charge as a whole is not subject to the criticism made under these assignments. A comparison of the said fifth paragraph of the charge with the charge reviewed and approved by the Supreme Court in the case of Grigsby v. Reib, supra, will show that this charge was probably copied from the charge given in that case.

[6] The tenth assignment complains that this language, "living in the same house in like manner as marks the intercourse between husband and wife," in the sixth paragraph of the charge as we have already quoted it, "lays undue stress upon occupying the same house and detracts from the importance attached by the law to the way they hold themselves out to the public." As we have already seen, the jury had just been told that in order to consummate a common-law marriage the plaintiff and defendant must "live and cohabit together as husband and wife"; that they must "professedly live together as husband and wife"; that they must "live together publicly as if the conjugal relation existed." We think the effect of the clause in question is not to stress the living together in the same house, but is to again stress the manner of their living together "in like manner as marks the intercourse between husband and wife." We do not think the jury could have been misled as to the law by this part of the charge.

[7] The twelfth and thirteenth assignments are based on the refusal of the court to give special instructions requested by the defendant to the effect that an agreement to become husband and wife only becomes effective upon open and public cohabitation as husband and wife and the cohabitation of the plaintiff and defendant in the states of Louisiana and Mississippi would not be a sufficient consummation of an agreement to be husband and wife made in Texas, but that, in order to constitute a valid common-law marriage between the plaintiff and defendant, it must be found that the necessary cohabitation took place in the state of Texas. We have already quoted a part of the court's charge in which the jury were required in determining the issues submitted to answer as the status may have been established in Texas. The court in this connection further charged the jury as follows:

"In this connection, I further charge you that certain testimony has been admitted as bearing upon the relations between plaintiff and defendant at other places than in the state of Texas. This testimony can be considered by you only for the purpose of assisting you, if it does assist you, in determining whether or not the agreement, if any, above referred to, was entered into, and whether or not the cohabitation of plaintiff and defendant, if any above explained, took place in the state of Texas."

This charge immediately followed that part of the fifth paragraph (and was a part of such paragraph) of the charge as we have already quoted it. Appellant's position as to this phase of the law was adopted and sufficiently presented to the jury by the

charge given. We need not decide whether this position itself is correct.

The special issues requested by defendant referred to in the fourteenth, fifteenth, and sixteenth assignments were sufficiently covered by the issues submitted and the charges given in connection therewith.

[8] The seventeenth assignment is based on an alleged inconsistency in the answers of the jury to certain issues submitted. These issues were as to the value of certain property at times and places stated in the submission of the issues. It is conceded by the appellant that a finding as to the matters submitted in these issues was not necessary to the rendition of the judgment, and the alleged inconsistency of itself does not require a reversal of the case. But it is claimed that these findings throw light on the character and dignity of the other findings in the case. We do not think there is any such inconsistency here as tends to discredit the verdict of the jury. The questions submitted were not clear, and it may be readily understood that the jury was confused thereby. So we do not think it necessary to go into the details of this assignment.

[9] The eighteenth, nineteenth, and twentieth assignments complain of the refusal of the court to permit the introduction of the testimony of various witnesses who would have testified to the effect that the plaintiff had given birth to an illegitimate child several years before the beginning of her relations with the defendant. The court did admit evidence as to the general reputation of the plaintiff for chastity both before and during the time of her relations with the defendant. There may be some doubt as to whether evidence of specific prior acts of unchastity with others than the defendant would be admissible. The question is somewhat analogous to that arising in cases where such evidence as to the prosecuting witness is offered in rape cases. There is a conflict in the decisions of the courts of other states as to the proper rule in such case, but it has been decided by the Court of Criminal Appeals of this state that in such cases evidence of the general reputation of the prosecuting witness for chastity is admissible, but that evidence of specific acts other than with the defendant is not. It was held, however, that evidence that the prosecuting witness had before the time of the rape given birth to an illegitimate child was admissible as proof of general reputation. Wilson v. State, 17 Tex. App. 533. We would be inclined to follow this decision and hold that the evidence offered was under the rule there established admissible. We are of the opinion, however, that its rejection did not probably affect the result of the trial in this case. Many witnesses testified that plaintiff's reputation for chastity was at this time bad. The defendant testified that the plaintiff told him of having given birth to the child, naming its father, and stating that it had been begotten while she was cooking for the family of such person. The evidence which was offered and rejected corroborated this statement, and tended to show that plaintiff was delivered of the child when she was about 13 years old. While the plaintiff testified that she had no improper relations with other men after she went to live with the defendant, she did not contradict defendant's testimony as to what she had told him about the child nor assert that she had had no such relations with other men before she began to live with the defendant. As we understand it, the only evidence which appellant claims the appellee offered as to her prior chastity is that contained in certain statements in a letter written by the plaintiff to the defendant on October 2, 1917, which we will refer to at considerable length in the consideration of another assignment. The particular statement is this, "As for my character, it is what you have made it." As we shall see in our further reference to the letter, the references to the plaintiff's character made in the letter are evidently in reply to some accusations of misconduct during their life together brought by the defendant against the plaintiff. We are of the opinion that the error if any in the rejection of the evidence was harmless.

[10] The twenty-first and twenty-second assignments are based on the submission of the fifteenth issue and the refusal of the court to set aside the finding of the jury in answer thereto, because it is claimed the evidence is insufficient to authorize the submission of the issue or support the finding thereon made by the jury. We have copied the fifteenth issue in our consideration of the second, third, fourth, and sixth assignments. We also, in discussing said assignments, copied some of the testimony given by the plaintiff in support of her pleading on this issue. We think the evidence warranted the finding of the jury. However, the judgment was based on the finding that there was a common-law marriage between the parties, and any error in respect to the submission of this issue would not be material. For the same reasons we overrule the twenty-third, twenty-fourth, twenty-fifth, and twenty-sixth assignments.

[11] The twenty-seventh assignment complains that the charge of the court "that all property acquired by either husband or wife during marriage is the common or community property of the husband and wife, except that which may be acquired by either gift, devise, descent," is not a correct statement of the law as applied to the facts of this

case. It appears that during the years 1907, 1908, 1909, 1910, and part of 1911 the plaintiff and defendant rented a house in Natchez, Miss., and that the plaintiff lived there with her son, Earl; that this arrangement was made for the purpose of sending the boy to school, as we have already stated in another part of this opinion. The evidence further showed that during these years a considerable part of the property sued for and partitioned under the decree of the court was acquired. This property consisted for the most part in certain shares of the capital stock of corporations doing business in Texas, also some municipal bonds. Evidence was also introduced as to law of Mississippi to the effect that personal property acquired in the name of the husband during marriage and while the husband is domiciled in that state becomes, under its laws, the absolute property of the husband, no matter where situated, and the wife has no interest therein so long as the husband lives. It is the claim of the appellant that these facts are sufficient to establish that this property acquired while the plaintiff was living at Natchez as stated was not the community property, and the court's charge was erroneous as applied to such facts. It is probably true that the facts were sufficient to make an issue as to the domicile of the defendant during this time, and, if the pleadings were sufficient to raise an issue as to the character of the property acquired during this period, it may be that the court was in error in peremptorily telling the jury that all property acquired during the marriage would be community. The plaintiff alleged that all such property was acquired by the joint labor of the plaintiff and the defendant during their marriage, and that it was in the possession of the defendant. This was all that was necessary for her to allege or prove in order to make her case as to the character of the property. R. S. art. 4623. The presumption referred to in this article of the statute applies to property in possession of either spouse at the time of the dissolution of the marriage as well by divorce as by death. Gameson v. Gameson, 162 S. W. 1169. The defendant pleaded only a general denial and limitations. The plaintiff made a prima facie case in pleading and proof when she alleged and showed that the property was acquired during marriage and was in the possession of defendant. We think the general denial did not warrant the introduction of evidence that would avoid this result, but, if the defendant wished to rely on such facts, it was necessary for him to plead them. Smothers v. Field, 65 Tex. 435; Moody v. Rowland, 100 Tex. 363, 99 S. W. 1112. The laws of another state are presumed to be the same as ours. If the defendant expected to rely on such laws to establish rights in property in litigation different from what such rights would be under our laws, it was necessary for him to plead such laws. This would be the logical result of the decision of the case of Smothers v. Field, supra, and there are a number of decisions to this effect. Kinney v. Tri-State Tel. Co., 201 S. W. 1183; Thompson v. Thompson, 202 S. W. 939; W. U. Tel. Co. v. Sloss, 45 Tex. Civ. App. 153, 100 S. W. 354. Proof without pleading was unavailing. Authorities already cited. See, also, Cooper v. Loughlin, 75 Tex. 524, 13 S. W. 37. So there was no issue under the pleading and the evidence as to the community ownership of this property, and there was no error in the charge. The twenty-eighth assignment is overruled for the same reasons.

[12] The twenty-ninth, thirtieth, and thirty-first assignments complain of the admission of the evidence of certain witnesses to the effect that plaintiff and defendant at certain places in Louisiana held themselves out as husband and wife and as members of the same family. The objection made is that such testimony is an opinion and conclusion. If the testimony were objectionable for this reason, which we do not hold, there would be no harm in its admission in these instances, for each witness detailed at length the facts of his or her association with the parties and on which this general statement was based.

[13] We do not think there was any harm done in the rejection of the testimony of Hugh Clines and James C. Watson to the effect that when they knew plaintiff on the farm and in the railway construction camps she was reputed to be defendant's housekeeper and cook. These witnesses did state that during the time they knew the plaintiff and the defendant they were each reputed to be single and went into detail as to the facts in connection with the relationship between them.

[14] The defendant introduced the evidence of Dick Green, an ex-convict, and plaintiff's brother, who testified that he worked on the farm near Farmington when defendant and plaintiff were living together there and also worked for the defendant when he was doing construction work in Texas; that at this time his sister was known as Mary Green; that she was cooking for defendant; that he never heard of her being married or claiming to be married to defendant until about the time the suit was filed. He testified on cross-examination, over defendant's objection, that it was a fact that he went to see the plaintiff soon after the filing of the suit by her; that this was the first time he had seen her since she left Texas in 1890; that he told the plaintiff on this visit that he could get $15,000 for her on compromise; that he advised her

to take this and keep it without consulting her lawyers or paying them; that he represented that she could take the $15,000 and buy a farm on which he and she, the only remaining members of the family alive, could live comfortably during the balance of their lives; that the witness secured work with the Phœnix Elevator Company, a concern in which defendant had a large interest, and of which Ben Smith was manager; that he, in company with the said Smith, again went ·to see the plaintiff; that he left the said Smith down the street and went to plaintiff's residence and told her that the said Ben Smith wanted to talk to her about the case and that he was going to make her an offer of $15,000 to settle the case; that the plaintiff told the witness that she did not want to see him, but nevertheless he returned with the said Smith, and the plaintiff refused to talk to them, and the witness left angrily. There was no evidence that the witness or the said Smith were authorized to act for the defendant in such matter, or that he had any knowledge of their actions, and complaint is made by the thirty-fourth assignment to the admission of such testimony.

[15] We think this testimony was admissible on cross-examination of the witness to show the "motives, inclinations, and prejudices" of the said witness. Ingersol v. McWillie, 9 Tex. Civ. App. 543, 30 S. W. 59. It makes no particular difference whether he was acting in such matter at the instigation of the defendant. If he were, of course the evidence would be admissible to show his relation to the defendant and his interest in his behalf; but, granting that he was acting absolutely on his own initiative, the evidence does show that he was attempting to take advantage of the situation to obtain some benefit for himself, and became angry when the plaintiff refused to accede to his plans. The evidence thus tends to disclose an attitude of hostility to the plaintiff. "It is always competent to show the relations which exist between the witness and the party against as well as for whom he was called." Thompson on Trials, § 450; Ingersol v. McWillie, 9 Tex. Civ. App. 543, 30 S. W. .59. The objection was made to the entire evidence. If any part of it was admissible, the objection was properly overruled, though other parts were inadmissible if properly objected to. Jamison v. Dooley, 98 Tex. 206, 82 S. W. 780; G., H. & S. A. Ry. Co. v. Gormley, 91 Tex. 393, 43 S. W. 877, 66 Am. St. Rep. 894.

[16, 17] The defendant introduced certain excerpts from a letter written by the plaintiff to the defendant dated October 2, 1917, to which we have already referred. The plaintiff then, over the objection of the defendant, was permitted to read the entire letter in evidence, and the ruling of the court on this matter is made the basis of the thirty-fifth assignment. We think we might dispose of this assignment by the holding that it is certainly true that some parts of the letter were admissible, and, as the assignment presents only a general objection to the admission of "all of the letter," it should be overruled for reasons already stated in the discussion of the preceding assignment. The bill of exception taken to the introduction of the letter shows that a general objection was taken to the reading of the letter as a whole, and also 19 separate objections urged to separate parts of the letter. The assignment, considered in the general language presented, would require the court to go through this long letter and take up each separate sentence thereof and announce a conclusion as to whether it was properly admitted. If separate and detached portions of the letter are objected to, and the objector wishes the separate objections considered, then they should be presented in separate and distinct assignments. Ft. Worth Compress Co. v. C., R. I. & T. Ry. Co., 18 Tex. Civ. App. 622, 45 S. W. 967. In the argument submitted under the assignment appellant presents objections to some portions of the letter not mentioned in any of the specific objections stated in the bill of exceptions. We have, however, considered the several objections urged to separate portions of the letter in the bill of exceptions, and have come to the conclusion that none of them would require a reversal of the case. The letter fills some six pages of printed matter, and we will not copy it in full here. Copies of certain portions which include the excerpts offered by defendant will serve to show the general tenor of the letter and enable us to dispose of the different objections made to separate parts of the letter by the statement of some general conclusions applicable to all of them. The defendant offered four separate excerpts from the letter, and for convenience we will divide into numbered paragraphs the portions of the letter we now copy, and italicize the parts that were offered by defendant.

(1) "Dear Issie: Your letter of the 29th just to hand and contents carefully read, and in reply will say as I have said before. *I have tryed ever way in the world I know how to get yo to settle with me fur my labor.* And you will not. I have offered ever thing fair and square and ofered to do anything yo say just same as I did last April and May when yo were coming down here to help me away from hear, and never kept your promise in many other things. I know your condition and feel sorry fur you but you brought it all on yourself. Now you must suffer as I am doing."

(2) "I have never wrote you a deceitful letter in my life. I mean ever word. I say, now. As fur my character it what you have made it. *You have told all kind tales to people that never knew anything and never would if you hadn't*

*told them now you want to let ever one hear no we are not married.* What pleasure do you get out that know one will give yo any credit fur abusing a woman that you have lived with 30 years. They will say if she is as bad as that why did you live with her. I have been honest true and faithful all through life to you now you no longer need me want to throw me away penless and old, but I must have something fur my 30 years labor, as I am not able to give it to your people you have give them enough. If the wurst must come let it come fur I have did my duty for you and did all I could to keep down disgrace on account Earl. Now seems you are determined not to do the right thing. I have tryed you ever way and made all king offers and you will not accept any-of them and the time is now at hand when I must make a move for the better or worst fur myself and sickly child. If you have no heart I have one. Now dear I will say this to you," etc.,

' (3) "All through life you have tryed to down me. *If you had did as you promised when you brought me on this river, married me, we now would of bin happy and our child would not be broken hearted.* You only care for a dollar; at judgment bar you will need more than dollar to pass. You harp about me haven access to your money, yes I had access to it to carry on your business but nothen more, had to sit down and give account of ever cent I spent, never spent it any more than any other old labor. I would saw sell chickens and eggs and lug slop fur hogs to make little money to spend and did 3 peoples work what all for nothen not if there is any law to get it I am glad I have keep a count of ever thing sence coming to town as will show what my expense is and not as you say, sixty six thousand in 13 years, and never was my expense in camp as great as in town and as fur Earl he won the bigest part of the money he had and can prove that thank God. He now says he will starve before he will gamble again when he was gambling and I would ask him not to he would say where am I going to get any money if I dont as papa dont want to give me any, fusses if he does, so you cant say we spent your money."

(4) The above is followed immediately by the following: "If I had knew then like I do now I would of spent it and not did half the work I did for got no thanks are pay for it. *You are entitled to pay me same as any one else. I worked fur you, was your wife also pardner is why I am entitled to half we made as you promised me you would marrie me and give me half of ever dollar you made if I would come to La. with you.* And you have failed now you want me to root hog are die you have your fortune made. Dear, I only ask you to act fair and I have waited patiently and you are as far from doing right as you were a year ago. Now if you want your trunk and want to get rid of me come and settle with me on the quiet are marry me as you promised. And take me to California with you as you should do. I will be to yo all any woman could be to a man she loves and do not force me to a long trial of court as it will be hard on us both and I am afraid to hard on you in your condition."

We quote the following passages from the letter, in addition to the foregoing, as tending to give the character to the letter that appellee's counsel claim for it:

"Dear, you have been hard on me fur no cause and if I half to sue you fur my money and bring disgrace on our child I love you and Pitty you but I will leave nothen else to do as you have refused ever offer I have made so do not expect me to express you any trunk are any thing else until you come to some agreement fur I can stand this life no longer. I even asked you to get me a little farm where I could of made a livening and you wouldnt do that. You wont do anything but abuse me. Any man but you would of made a home for his ·family befure he left them. * * * It is useless to tell you all this but you are so hard on me cant help it now Dear it is useless fur you to lisen to Laycock telling you not to give me anything. He will get you in trouble and I dont want to do anything that cause you worry or trouble but you know you half to pay labor and as you say you are through with me then pay me fur my services fur 30 years I was more than comsary cleark. I was your wife cook and general camp manager. * * * I have been fooled long enough 30 years. You must do something now I cannot take any more promises that are never filled you have bin promising me ever since 1886 promises that have never been filled time it up. Some of them must be filled the sooner the better. You know you do as you please but my advice to you is to get this difference strait before you leave for any place. So you can go with clear mind fur just as I say I cannot suffer any longer as I am and our child is near crasey with shame befure God and man to make innocence child suffer as he is when no one to blame but you if you had did as you promised wouldent any of us had to of suffered as we are. You brought me hear so come take me away or help me get away. You are mine and I am not going to give you up until you do the right thing by me."

She subscribes herself, "Your ever loveing wife until death."

The defendant introduced the excerpts from the letter offered by him as admissions and for the purpose of getting the benefit of these inferences to be drawn therefrom: (1) That plaintiff admitted therein that her right was merely in the nature of a claim for labor performed; and (2) that she therein admitted that she and the defendant were not husband and wife, but that their relations had been the result of an unfulfilled promise of marriage. It is certainly true that every part of the letter that might in any way tend to explain or modify or affect the meaning of these excerpts would be admissible. Rouse v. Whited, 25 N. Y. 170, 82 Am. Dec. 337, and notes; Jones on Evidence (Horwitz) §,171; Wigmore on Evidence, § 2113. If the tendency of the letter as a whole was to disclose that the controlling thought of the plaintiff as to these matters was not fairly reflected in the reading of these detached excerpts alone, the plaintiff was entitled to read the letter as

such connected whole with every part included as would tend to give character to the letter and show the real thought from which it proceeded. We think that it may be reasonably contended in appellee's behalf: That the meaning to be derived from the letter as a whole was not inconsistent with the alleged agreement of May, 1886, and the subsequent living together under it, as now contended for by plaintiff, but that plaintiff was maintaining, in the letter, that she had lived with the plaintiff as his wife, had been true and faithful to him as such and had at least the moral right of a wife; that she was thereby asserting that the defendant had from time to time promised a ceremonial marriage as an indisputable and legal evidence of their marriage agreement; that it may be inferred therefrom that plaintiff was when writing the letter probably under the impression that it required a ceremonial marriage in order to enable her in law to assert the rights of a wife, and, as defendant had repudiated whatever moral rights she had, she was thus driven to assert what she may have conceived to be her legal rights on a claim for compensation for her work of 30 years rendered under an agreement which the defendant had repudiated.

If it might have been reasonably contended by the plaintiff that this or any similar construction of the meaning of the letter was the correct theory of the prevailing thought of the plaintiff, then every part of the letter as might add any strength to or show the consistency of such theory, as opposed to the meaning which appellant sought to deduce from the reading of the extracts offered by him, was admissible. The complaints of the defendant's treatment of the plaintiff charges that he had not been fair with her, that he had not fulfilled his promises to her and cared only for a dollar, the plaintiff's assertion of her own faithfulness and the detailing of the work she had done, the references to the son and the defendant's treatment of him (these being the general character of the portions of the letter to which appellant objected), all tend to support and establish a theory of the meaning of the letter, such as we have stated, inconsistent with the meaning of the excerpts offered by defendant when considered alone. They tend to show that she did not mean to say that she had lived with and worked for the defendant only as his concubine and servant. Under these circumstances we do not think there was any error in the action of the court in permitting the letter to be read as a whole. If there were any of the statements that were admitted over objections that were not admissible under this general statement of the considerations that should control their admissibility, they formed, in our opinion, a very inconsiderable part of the letter, and their admission did not prob-ably result in harm. In fact, we are inclined to think that this might properly be said of a great many of the portions of the letter to which objection was made. Plaintiff testified to many of the facts stated in the letter. The arguments made by plaintiff in her behalf and strictures on the conduct of the defendant are such as were likely to have been made by plaintiff's counsel to the jury and to have naturally suggested themselves to the jury.

[18] There was no reversible error in the action of the court in permitting the plaintiff to testify as to the effect the information of defendant's marriage to another woman in 1918 had on her health. This testimony was admitted on the issue of divorce.

We do not think the trial court abused his discretion in permitting plaintiff's attorneys to question her while on the witness stand in the manner complained of in the thirty-seventh assignment.

[19] The answer of the witness rejection of which is complained of by the thirty-eighth assignment was not admissible. If the answer did have the meaning which appellant attaches to it so as to have been admissible, its rejection was not harmful, as it was only cumulative of a vast amount of similar testimony that was introduced.

We have found no error assigned which in our opinion requires a reversal of the judgment of the lower court, and such judgment will therefore be affirmed.

## On Motion for Rehearing.

[20] Appellant says in his motion for rehearing that there was no evidence introduced on trial that appellee, at the time she went to live with appellant, was a "buxom, good-looking girl," as stated in our opinion. The fact is immaterial, and we withdraw the statement. Of course, appellant does not contend that this fact was material, but refers to the matter as evidencing that we relied on appellee's statement of the facts instead of the record, and proceeds from this point to argue that we drew incorrect conclusions as to other matters that were more material. The only complaint of error in any specific statement of fact made by us is in reference to the pay rolls and time books. We think the evidence sustains the statement we made as to this matter. We did not say, or mean to say, that all of the time books and pay rolls covering the 30 years were in evidence. Most of these had been destroyed, and parts of the books that were introduced had been torn out, and appellant suggests that those parts of the book which may have been damaging to plaintiff were missing, designedly or otherwise. Whatever might be the truth as to this, the evidence does show that the appellant testified before the production of these books that while he was working on

the railroad he kept time books and made up pay rolls, and that plaintiff's name was on these books, and after the books were produced he testified that he did not keep the time of the cook, and the cook's time did not appear on the pay roll. The production of the books did also tend to contradict appellant's evidence to the effect that plaintiff had nothing to do with this part of the business, but merely served him as a cook and to corroborate the plaintiff in her statement that during all the time they were together she took an active part in the appellant's business. All of this is only important as showing that the evidence was such that it required a weighing of the testimony, the acceptance of some of it, and rejection of parts, in order to arrive at the truth, and that the truth is not so manifest as that we can declare what it is in the face of the finding of the jury, whose province it was to identify it from the mass of conflicts and contradictions in the case.

Appellee calls our attention to the fact that the witness Pat Harris testified that he had known plaintiff and defendant in Texas, Louisiana, and Mississippi since 1889, and that they lived together and were known in such places as husband and wife; so that plaintiff's testimony as to the manner of them living together in Texas is supported by the direct testimony of two witnesses instead of one, as stated in the opinion, and we make this correction, in such statement.

[21] The motion for rehearing urges strongly that we were in error in our holding on the twenty-seventh and twenty-eighth assignments. We have carefully reviewed these assignments, and are of the opinion that the holding was correct. We have become convinced, however, that there are reasons in addition to that stated in the opinion why the assignments should be overruled. In the first place, we believe that the trial court would have been warranted in concluding from plaintiff's own testimony that he had no domicile in Mississippi from 1907 to 1911, during the time plaintiff had a house rented in Natchez, and was there part of the time sending the boy to school. This quotation from the appellant's testimony fairly presents his evidence as to his domicile in Mississippi:

"Earl went to school in Natchez about twelve years. Most of the time for about four years while Earl was going to school in Natchez the plaintiff lived in Natchez with him. That was during 1907, 1908, 1909, 1910, and part of 1911. Plaintiff also lived in Natchez in 1915, or rather I moved there in 1915. She was living in Natchez when I left that country. During the first four years the plaintiff lived in Natchez she had a house rented. She rented it herself and paid the rent. She paid the rent herself. She got the money to pay the rent from me. During the period of four years from 1908 to 1911, inclusive, I was living in the camp in Louisiana. I spent about six weeks during those four years at Natchez. Those six weeks were spent there at different times."

He testified in another part of his testimony that—

"Plaintiff was at the camp practically all of the time except when she was living at Natchez. When she was in Natchez she would come to the camp on Saturday."

The plaintiff herself testified that during this period she spent a great part of the time at the camp in Louisiana. The defendant by his own testimony thus fixed his residence in Louisiana, and his testimony and that of the plaintiff shows that the stay of the plaintiff in Mississippi was only for a temporary purpose and did not fix the appellant's domicile in that state over his own express claim of continued residence in Louisiana. It was not shown that any of the property was acquired after the plaintiff and defendant moved to Natchez in 1915, or what, if any, was acquired during the short time that appellant was engaged in levee work and in camp in the state of Mississippi.

[22] We are also of the opinion that, if there was any issue as to whether appellant's domicile was in Mississippi during the period of time from 1907 to 1911, the appellant, on account of his failure to request the submission of any such issue to the jury, consented that the court should decide it. R. S. art. 1985; Moore v. Pierson, 100 Tex. 113, 94 S. W. 1132. It was our opinion in the first consideration of the case that the giving of the charge referred to in the twenty-seventh assignment was equivalent to an exclusion of the issue, and that objection to the charge by appellant was all that was necessary, but we believe we were wrong in this. Moore v. Pierson, supra.

The other matters presented in the motion have been sufficiently considered, we think, in the original opinion. The motion for rehearing will be overruled.