Bryan Eric WOLFE, Appellant,

v.

The STATE of Texas.

No. 74522.

Court of Criminal Appeals of Texas.

Nov. 12, 2003.

George Michael Jamail, Beaumont, for Appellant.

Wayln G. Thompson, Asst. DA, Beaumont, Matthew Paul, State's Attorney, Austin, for State.

### OPINION

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, JOHNSON, HOLCOMB, and COCHRAN, J.J., joined.

Appellant Bryan Eric Wolfe was convicted of capital murder and sentenced to death. We affirmed the conviction and sentence on March 6, 1996. Appellant subsequently moved for post-conviction forensics testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure and requested money for appointment of an independent expert to review both the trial DNA test results and the post-conviction DNA test results. The convicting court granted the motion for post-conviction DNA testing, but denied appellant's request to be appointed an independent expert. Appellant appeals solely on the basis that he is entitled to have an independent expert appointed to review both sets of DNA test results for him.

### Facts

In 1992, an 84–year–old woman was found stabbed to death in her home. Using the R.F.L.P. DNA testing method, Cellmark Diagnostics[1] ran DNA tests on a bloody towel found in the victim's home and on scrapings found outside the victim's front door. Cellmark then compared those test results to the banding patterns found in DNA samples from appellant, an African–American. The banding patterns from the bloody towel matched appellant's DNA and showed that the odds of another African–American having the same banding patterns were 1 in 1.17 million. The banding patterns from the scrapings on the door showed a 1 in 16 million likelihood that another African–American would match the same DNA pattern. Appellant was convicted, and later requested additional DNA testing under Chapter 64. The trial judge ordered the Texas Department of Public Safety (DPS) to conduct DNA tests using the newer PCR/STR[2] method. Appellant made no objection to the selection of the DPS as the testing

---

1. Cellmark Diagnostics is a laboratory which conducts DNA identity testing.

2. The PCR method is a newer method which allows smaller samples to be tested for DNA.

laboratory. The results of the new tests also matched appellant's DNA. The tests on samples from the bathroom floor, bathtub, and a bedroom towel indicated that the odds of another African–American matching the DNA pattern were 1 in 1.2 quintillion. The samples from the doorknob scrapings, the bathroom counter, and a bathroom towel, resulted in odds of another match at 1 in 415 trillion African–Americans. And the DNA samples from a black coin purse found on the victim resulted in odds of 1 in 1.2 quintillion.

Appellant alleges there is a conflict between the pre-trial DNA test results and the post-conviction DNA test results, and that neither he nor his attorney is capable of understanding the results without expert assistance. Appellant argues that he must be appointed an independent DNA expert to review the results and explain them to his attorney. Without the right to expert assistance, appellant urges that he is being denied his Sixth Amendment right to effective assistance of counsel, as well as being denied the proper tools to attack the evidence against him. The State, however, asserts that no conflict exists between the two sets of test results. Rather, the State insists that the post-conviction test results more conclusively link appellant to the crime. Furthermore, the State contends that appellant is making a collateral attack not authorized under Chapter 64 of the Texas Code of Criminal Procedure.

### Issue

The issue presented by appellant is whether the district court erred in denying appellant expert assistance with regard to its Chapter 64 hearing. In order to answer this question, we must first determine whether, under Chapter 64 of the Texas Code of Criminal Procedure, an indigent defendant can appeal a decision by the convicting court denying him an independent expert, or whether such an action is merely a collateral attack for which no appeal is authorized. We agree with the State that appellant's attack is collateral and thus not within the scope of appeal as laid out by Article[3] 64.05 of the Texas Code of Criminal Procedure.

### Legislative History

 Whenever possible, this Court interprets a statute pursuant to its "plain [textual] meaning" and will not consult outside sources unless the statute is ambiguous or unless its literal translation will result in "absurd consequences." *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim. App.1991). Our overall goal is, of course, to carry out the legislative intent. *Id.* at 785; *Kutzner v. State,* 75 S.W.3d 427, 433 (Tex.Crim.App.2002). Article 64.05 is unambiguous on its face.[4] However, because our primary goal is to carry out the legislative intent of the statute, we provide the legislative history of Chapter 64 in order to highlight the harmony between the legislative intent and our holding today.

Article 64.05 of the Texas Code of Criminal Procedure sets out the appeal process under Chapter 64. Tex.Code Crim. Proc. Ann. art. 64.05 (Vernon Supp. 2003). At the time of appellant's motion, Article 64.05 read in pertinent part that "[a]n appeal of a finding under *Article 64.03 or 64.04* is to a court of appeals, except that if the convicted person was convicted in a capital case, the appeal of the finding is a direct appeal to the court of criminal appeals." *Id.* (emphasis added). In a recent case, this Court noted that, "[a]lthough Article 64.05 provides for

---

**3.** Unless otherwise noted, all future references to Articles refer to the Texas Code of Criminal Procedure.

**4.** As discussed, Article 64.05 specifically prescribes which decisions by the court may be appealed.

appealing a finding under Articles 64.03 or 64.04, there are no provisions for appealing a finding regarding indigence or appointment of counsel under [Article] 64.01(c)." *Neveu v. Culver*, 105 S.W.3d 641, 643 (Tex. Crim.App.2003). In *Kutzner v. State*, this Court observed that Senate Bill 3 (now codified as Chapter 64) as originally drafted did not authorize an appeal of any of the trial judge's Chapter 64 determinations. Tex. S.B. 3, 77th Leg., R.S., 2001 Tex. Gen. Laws 2; *Kutzner*, 75 S.W.3d at 433. Later, by amendment, the Senate Jurisprudence Committee added wording to allow appeal of a finding under Article 64.04. *See* SENATE JURISPRUDENCE COMM., BILL ANALYSIS, Tex. S.B. 3 at 3–4, 77th Leg., R.S., (February 13, 2001). The language authorizing appeal of findings under Article 64.03 was not added until even later, by an additional amendment. *See* HOUSE CRIMINAL JURISPRUDENCE COMMITTEE, BILL ANALYSIS, Tex. S.B. 3 at 3, 77th Leg., R.S., (March 4, 2001); *see also Kutzner* at 434. In *Kutzner*, this Court acknowledged that, before specifically adding the provision for appeals as to Article 64.03, Article 64.05 necessarily restricted appeals solely to those matters falling under Article 64.04. *Kutzner*, 75 S.W.3d at 434. We adopt that position today. Because it was necessary for the legislature to add specific language to authorize an appeal of determinations under Articles 64.03 and 64.04, and because the legislature did not designate any other sections in Article 64.05, the legislative intent is in harmony with the plain language of the statute; the statute does not authorize an appeal of findings under any articles other than 64.03 and 64.04. The question thus becomes whether the decision by the trial court denying appellant a post-conviction DNA expert falls under the scope of Articles 64.03 or 64.04. We believe it does not.

*Discussion*

■ The convicting court's decision to deny appointment of a post-conviction DNA expert does not fall within the purviews of Article 64.03 or 64.04 and is therefore not reviewable on appeal under Article 64.05. Article 64.03 provides the specific requirements that must be met for a judge to grant post-conviction DNA testing. TEX.CODE CRIM. PROC. ANN. art. 64.03(a), (c) (Vernon Supp.2003). It also specifies the procedure by which a laboratory is selected for testing, the standards that must be met by testing facilities, and the procedure for handling test results. *Id.* at 64.03(c)-(e). In appellant's case, the trial court *granted* the motion for post-conviction DNA testing under Chapter 64. However, appellant does not contest the granting of the post-conviction DNA testing. Nor does appellant contest the selection of the DPS laboratory as the testing facility, the qualifications of the laboratory, or how the test results were handled. Article 64.03 makes no mention of independent expert review, and a decision by the judge concerning whether to appoint an expert for the appellant has no bearing on the areas within that article's scope. Therefore, this attempt to appeal does not fall under Article 64.03.

Article 64.04 orders the trial judge to "hold a hearing and make findings as to whether the results are favorable" to appellant. TEX.CODE CRIM. PROC. ANN. art. 64.04 (Vernon Supp.2003). It also sets out the standard by which the court may find the results favorable ("had the results been available before or during the trial of the offense, it is reasonably probable that the person would not have been prosecuted or convicted"). *Id.* Here, the court made a finding that the results were not favorable. While appellant could, he does not contest that finding. In fact, appellant's attorney admitted that the court's

ruling on the tests was fair and that the results were "unfavorable" under the Chapter 64 test. No language in Article 64.04 could be interpreted to expand the trial judge's authority to rule beyond the "favorable" or "not favorable" findings.

■ Chapter 64 authorizes the convicting court to order DNA *testing,* and no more. In *State v. Patrick,* 86 S.W.3d 592 (Tex.Crim.App.2002), this Court noted that before Chapter 64 was enacted, no trial court had jurisdiction to make orders related to post-conviction DNA testing. Chapter 64 expanded the jurisdiction of the trial court, but only to the extent prescribed by the statute. Only the Legislature can give a court authority to hear an appeal. *State v. Waller,* 104 S.W.3d 307, 309 (citing *Rushing v. State,* 50 S.W.3d 715, 722 (Tex.App.Waco 2001), *aff'd* 85 S.W.3d 283 (Tex.Crim.App.2002)). We hold that because the legislature has not specifically provided for appeals of issues unless they are within 64.03 or 64.04, the trial court's refusal to appoint an expert is not appealable under Chapter 64.

We acknowledge that House Bill 1011, amending Chapter 64, became effective on September 1, 2003 (*after* appellant filed this appeal). Act of Sept. 1, 2003, 78th Leg., R.S., ch.13, 2003 Tex. Gen. Laws 13 (to be codified as an amendment to Tex. Code Crim. Proc. art. 64 (2001)). The Bill changed Article 64.05 from originally reading "[a]n appeal of a finding under *Article 64.03 or 64.04,*" to make it read, simply,

"[a]n appeal under this chapter." [5] *Id.* at section 5. House Bill 1011 specifically states that any person who made a motion for DNA testing before September 1, 2003 "is covered by law in effect when that motion was submitted." Act of Sept. 1, 2003, 78th Leg., R.S., ch.13, 2003 Tex. Gen. Laws 13, sect. 8, 9. Appellant filed this motion at a time when appeals were only allowed under sections 64.03 and 64.04. The subject matter of his complaint does not fall within those sections.

Our holding today does not contravene the purpose of Chapter 64, which is to "give convicted people full access to the courts ... and to provide a check on individual courts' decisions." HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. S.B. 3 at 8, 77th Leg., R.S. (March 21, 2001); *Kutzner* at 434–435. Appellant was given the opportunity to have post-conviction DNA tests performed. The judge then ruled on whether the tests were favorable or unfavorable to appellant. Chapter 64 authorizes no further actions. Appellant has received his "check" on the court by being granted the post-conviction DNA test results, and the intended purpose of Chapter 64 has been fulfilled.

We therefore dismiss appellant's appeal.

WOMACK and HERVEY, J.J., concurred in the judgment.

---

**5.** Such a change necessarily means one of two things: either the Legislature is broadening the scope of the appeals under Chapter 64 to include issues pertaining to all Articles of Chapter 64; or, the Legislature always intended any decision under Chapter 64 to be appealable and is simply correcting a drafting mistake. We conclude that the Legislature is broadening the scope of Chapter 64 to include appeals not previously permitted. As mentioned, the Legislature has taken separate steps by amendment to add appeals for issues under the scope of Articles 64.03 and 64.04. *See Kutzner* at 434. If the Legislature had wanted to include an appeal process for the entire Chapter 64 at that time, it could have done so. It did not. Instead, when crafting Article 64.05, the Legislature specifically referred only to certain articles by using the precise language: "[a]n appeal ... under *Article 64.03 or 64.04.*" TEX.CRIM. PROC.CODE ANN. art. 64.05 (Vernon Supp.2003) (emphasis added).

KEASLER, J., filed this concurring opinion.

The majority concedes that this statute is unambiguous, but it nevertheless proceeds to examine the legislative history "in order to highlight the harmony between the legislative intent and [its] holding."[1] I vigorously oppose this unnecessary excursion.

We made clear in *Boykin v. State*[2] that [w]hen attempting to discern this collective legislative intent or purpose, we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment. We do this because the text of the statute is the law in the sense that it is the only thing actually adopted by the legislators, probably through compromise, and submitted to the Governor for her signature. We focus on the literal text also because the text is the only definitive evidence of what the legislators (and perhaps the Governor) had in mind when the statute was enacted into law. There really is no other certain method for determining the collective legislative intent or purpose at some point in the past, even assuming a single intent or purpose was dominant at the time of enactment. Yet a third reason

for focusing on the literal text is that the Legislature is constitutionally entitled to expect that the Judiciary will faithfully follow the specific text that was adopted.[3]

We continued that "[i]f the plain language of a statute would lead to absurd results, or if the language is not plain but rather ambiguous, then and only then, out of absolute necessity, is it constitutionally permissible for a court to consider, in arriving at a sensible interpretation, such extratextual factors as executive or administrative interpretations of the statute or legislative history."[4] We noted that "[t]his method of statutory interpretation is of ancient origin and is, in fact, the only method that does not unnecessarily invade the lawmaking province of the Legislature. The courts of this and other jurisdictions, as well as many commentators, have long recognized and accepted this method as constitutionally and logically compelled."[5]

The majority goes far beyond *Boykin's* boundaries and into the statute's legislative history for no good reason. Only a few weeks ago, in *Ex parte Peterson*,[6] the majority quoted my concurring opinion in *Watts v. State*[7] for the proposition that "[t]he prudent jurist will typically decide cases on the narrowest, surest ground available." Alas, apparently the Court was

---

1. *Ante*, op. at 370.

2. 818 S.W.2d 782 (Tex.Crim.App.1991).

3. *Id.* at 785.

4. *Id.* at 785–86.

5. *Id.* at 786 (citing *West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *Demarest v. Manspeaker*, 498 U.S. 184, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991); *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917);

*Republicbank Dallas v. Interkal*, 691 S.W.2d 605, 607 (Tex.1985); *Sparks v. State*, 76 Tex. Crim. 263, 174 S.W. 351, 352 (1915); E. Crawford, THE CONSTRUCTION OF STATUTES § 164 (1940); H. Black, HANDBOOK ON THE CONSTRUCTION AND INTERPRETATION OF THE LAWS §§ 24–27, 85 (1896); 2A N. Singer, SUTHERLAND ON STATUTORY CONSTRUCTION §§ 46.01–46.07 (1984 & Supp.1991); 1 W. LaFave & A. Scott, SUBSTANTIVE CRIMINAL LAW § 2.2 (1986); 82 C.J.S. Statutes § 322 (1953)).

6. 117 S.W.3d 804, 807 (Tex.Crim.App., 2003).

7. 99 S.W.3d 604, 615 (Tex.Crim.App.2003) (Keasler, J., concurring).

just kidding. What I said in *Watts* bears repeating today:

Statements that are "unnecessary to the issue upon which the . . . Court . . . is writing" are dicta.[8] Dicta include "[a]n opinion expressed by a court, but which, not being necessarily involved in the case, lacks the force of an adjudication; an opinion expressed by a judge on a point not necessarily arising in a case; an opinion of a judge which does not embody the resolution or determination of the court, and made without argument, or full consideration of the point; not the professed deliberate determination of the judge himself."[9]

It is dangerous to include dicta in court opinions. "With neither case facts to sharpen analysis nor help from advocates' arguments, a dictum-issuing court necessarily writes broadly and ambiguously."[10] Additionally, "a court that employs a rule broader than the facts before it may properly consider the rule in relation to that particular case; however, the rule's potential bearing on all other cases will rarely be completely contemplated by the court."[11] Finally, "[i]t is often unwise for an appellate court to discuss issues not implicated by the facts of the case at bar, for it is difficult to test the operational dynamics of a legal rule being assembled in a factual vacuum."[12]

As Chief Justice Warren has explained, "[i]t has not been the custom of the Court, in deciding the cases which come before it, to write lengthy and abstract dissertations upon questions which are neither presented by the record nor necessary to a proper disposition of the issues raised."[13] He complained that the majority's opinion in that case "departed from this custom and is in the nature of an advisory opinion, for it attempts to resolve with finality many difficult problems which are at best only tangentially involved here."[14]

Given the prevalence of dicta in court opinions and the standard complaints from dissenters, "[o]ne wonders why obiter dicta are even present."[15] One author has some theories:

Sometimes, they are included for reasons of contrast. Sometimes, judges appear to be writing short essays on the law. Perhaps the judge wants the opinion included in a case book. Perhaps he is bucking for another job. Perhaps the judge writes well and is looking for a mode of self-expression. Perhaps he does not write the opinions at all but leaves them to law clerks who do not know any better, or who think they still are writing term papers. Perhaps all of these reasons apply, and perhaps there

---

8. Michael Sean Quinn, *Symposium on Taking Legal Argument Seriously: Argument and Authority in Common Law Advocacy and Adjudication: An Irreducible Pluralism of Principles*, 74 Chi.-Kent L.Rev. 655, 713 (1999).

9. *Grigsby v. Reib*, 105 Tex. 597, 602, 153 S.W. 1124, 1126 (1913).

10. Richard B. Cappalli, *What is Authority? Creation and Use of Case Law by Pennsylvania's Appellate Courts*, 72 Temple L.Rev. 303, 310 (1999).

11. Joshua C. Dickinson, *Casenote: Standing Requirements for Intervention and the Doctrine of Legislative Standing: Will the Eighth Circuit "Stand" by Its Mistakes in Planned Par-*

*enthood of Mid–Missouri & Eastern Kansas, Inc. V. Ehlmann?*, 32 Creighton L.Rev. 983, 1024 (1999).

12. Evan Tsen Lee, *Deconstitutionalizing Judiciability: The Example of Mootness*, 105 Harv. L.Rev. 605, 649 (1992).

13. *Culombe v. Connecticut*, 367 U.S. 568, 635–36, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (Warren, C.J., concurring).

14. *Id.*

15. Quinn, 74 Chi.Kent L.Rev. at 713.

are others as well.[16]

Regardless of the reasons, the urge to write beyond what is necessary in any case should be tamed. Justice Selya of the United States Court of Appeals for the First Circuit argues that appellate courts should strive for prudence in their opinions. "[P]rudence counsels judges not to reach out and decide large, controversial issues in the absence of a necessity to do so. The prudent jurist will typically decide cases on the narrowest, surest ground available, leaving tougher calls, with broader implications, for future cases that squarely present them." [17]

I would hold that the statute's plain language unambiguously prevents Wolfe's appeal. I would follow *Boykin* and not go beyond that conclusion. Because the majority does not do so, I concur only in its result.

---

16. *Id.*

17. Hon. Bruce M. Selya, *Essay: Thoughts from the Bench: The Confidence Game: Pub-* lic Perceptions of the Judiciary, 30 NEW ENG. L.REV. 909, 916 (1996).